696 So.2d 1257 (1997)
Johnny TITUS, Appellant,
v.
STATE of Florida, Appellee.
No. 96-3259.
District Court of Appeal of Florida, Fourth District.
July 2, 1997.
*1258 Richard L. Jorandby, Public Defender, and Louis G. Carres, Assistant Public Defender, West Palm Beach, for appellant.
Robert A. Butterworth, Attorney General, Tallahassee, and Barbra Amron Weisberg, Assistant Attorney General, West Palm Beach, for appellee.
FARMER, Judge.
Although not so framed by the parties, the real issue in this case is whether there is a "rooming house" exception to the warrant requirement of the Fourth Amendment to the United States Constitution for police officers to enter and search a kitchen in such a residence. We think not and reverse the conviction in this case.
The facts are starkly simple. An officer on routine patrol in a residential section of the city was stopped by a citizen who told him that someone was smoking narcotics in a nearby home. The officer, who was familiar with the home from previous visits, walked in the back door without any prior announcement or permission and proceeded to the kitchen on the first floor. There he saw defendant placing a pipe into his pocket and the other person smoking crack cocaine in a similar pipe. He immediately arrested both.
Defendant moved to suppress the evidence. The officer and both persons arrested  defendant and a Ms. Hudson  testified at the evidentiary hearing. Both of the persons arrested testified that they were or had been residents of the rooming house.[1] The testimony showed that it was a two-story house surrounded by a fence, with entrances from the street on the side and in the back. Ms. Hudson testified that the back door has both a screen door and wooden outer door which are left open during the day, but the officer testified that on the day in question there were no doors on the back entrance, only empty hinges.
Both floors are bisected by a corridor with rooms on each side. The officer testified that one can stand at either the front or rear entrance and see through the opposite entrance of the building. The kitchen is located at the back end on the ground floor on one side of the corridor. The testimony was that the interior of the kitchen could not be seen from the threshold or outside the rooming house, but it could be seen from the corridor. The residents testified that the house is, effectually, private for the tenants and their guests, and that the kitchen is available for use only by the tenants. In fact, some of the tenants store personal belongings in the kitchen.
Ms. Hudson testified that there were "4 or 5 people just off the street" in the kitchen area that day who were neither tenants nor guests. Neither she nor anyone else testified *1259 that the house or kitchen is open to the public generally, or that the general public is permitted to enter the premises without restraint. Both the officer and one of the residents testified that the tenants keep locks on the entrance to their individual rooms, but no one testified that the absence of locked doors at the entrances was intended as an invitation to the public to enter at will. The state stipulated that the officer did not have probable cause to enter the premises.
During closing argument the court commented to the prosecutor as follows:
"All right, now if he had no reason to go in the house, then it seems to me that the only way the search can be sustained is to determine that a police officer has the right ... any time a police officer is riding down Ninth Street and wants to go in the rooming house and look around, they can."
To this, the prosecutor responded that "under this fact situation, I think that an officer any time of the day or night could walk through this open area, walk through the back, and leave." He then added,
"But just to distinguish the types of areas, my position is he could walk through the common areas of the building  it doesn't have a locked door on either side."
In refusing to suppress the evidence, the court made the following findings of fact:
"One, that the defendant Johnny Titus was a tenant or lessee in the rooming house; two that [Ms.] Hudson was an invited guest in the rooming house; three that both of them had reasonable expectations of privacy in the rooms in the rooming house that were utilized for the sole and exclusive use of the lessee for that particular room. I find that, as to the kitchen area, that it was accessible from both the front door and the back door to not only the tenants or their invited guests but to the persons who were neither tenants nor invited guests. I find that there was no security on the doors, as testified to by the officer, and as I believe corroborated by at least one of the witnesses, one of the defendants. I find that Ms. Hudson  I recall that Ms. Hudson testified there were persons in the kitchen who were neither invited guests nor tenants, and I find that's further evidence that the rooming  the kitchen  was accessible to persons.... I find, therefore, that the officers in this instance, as any other member of the public in the area, apparently could have come into the home, or come into the rooming house into the common areas."
The court thereupon found the paraphernalia in plain view. The trial judge further explained that he read State v. Batista, 524 So.2d 481 (Fla. 3d DCA 1988), cited by the prosecutor, to hold that no resident of an unlocked, unsecured common or shared area in an apartment building has a reasonable expectation of privacy in such areas.
We begin with the principle that "[w]ithout question, the home is accorded the full range of Fourth Amendment protections." Lewis v. United States, 385 U.S. 206, 210, 87 S.Ct. 424, 427, 17 L.Ed.2d 312 (1967). As the Supreme Court also once explained:
"The Fourth Amendment, and the personal rights which it secures, have a long history. At the very core stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion."
Silverman v. United States, 365 U.S. 505, 511, 81 S.Ct. 679, 683, 5 L.Ed.2d 734 (1961).[2] The history of the home as a Fourth Amendment object of punctilious protection was thoroughly justified in the following:
"Resistance to these practices[3] had established the principle which was enacted into the fundamental law in the 4th Amendment, that a man's house was his castle, and not to be invaded by any general authority to search and seize his goods and papers.... `The maxim that `every man's house is his castle' is made a part of our *1260 constitutional law in the clauses prohibiting unreasonable searches and seizures, and has always been looked upon as of high value to the citizen.... [N]o man's house can be forcibly opened, or he or his goods be carried away after it has thus been forced, except in cases of felony; and then the sheriff must be furnished with a warrant, and take great care lest he commit a trespass. This principle is jealously insisted upon....'
"... It is not the breaking of his doors and the rummaging of his drawers that constitutes the essence of the offense; but it is the invasion of his indefeasible right of personal security, personal liberty, and private property, where that right has never been forfeited by his conviction of some public offense,  it is the invasion of this sacred right which underlies and constitutes the essence of Lord Camden's judgment....' The effect of the 4th Amendment is to put the courts of the United States and Federal officials, in the exercise of their power and authority, under limitations and restraints as to the exercise of such power and authority, and to forever secure the people, their persons, houses, papers, and effects, against all unreasonable searches and seizures under the guise of law."
Weeks v. United States, 232 U.S. 383, 389-392, 34 S.Ct. 341, 343-44, 58 L.Ed. 652 (1913).[4] Moreover, as the Court reemphasized in Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969):
"Even in the Agnello case the Court relied upon the rule the `[b]elief, however well founded, that an article sought is concealed in a dwelling house, furnishes no justification for a search of that place without a warrant. And such searches are held unlawful notwithstanding facts unquestionably showing probable cause.' 269 U.S., at 33, 46 S.Ct., at 6. Clearly, the general requirement that a search warrant be obtained is not lightly to be dispensed with, and `the burden is on those seeking [an] exemption [from the requirement] to show the need for it....'"
395 U.S. at 762, 89 S.Ct. at 2039 [citing Agnello v. United States, 269 U.S. 20, 33, 46 S.Ct. 4, 6, 70 L.Ed. 145 (1925); and United States v. Jeffers, 342 U.S. 48, 51, 72 S.Ct. 93, 95, 96 L.Ed. 59 (1951)]. We note that in the present case the state made no attempt to show any need for the officer to make an immediate entry because of some particular circumstance inside the house. Rather, the sole basis for proceeding without a warrant or seeking consent to go in seems to have been the absence of doors or locks preventing the officer's entry.
In the present case, we deal with a rooming house.[5] Traditionally, that is a residence is which tenants have individual rooms and share some common spaces  whether a bath, a dining room or as here a kitchen. The Supreme Court has directly confronted a warrantless search of a rooming house in McDonald v. United States, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948). There a police officer climbed into a window in the *1261 landlady's bedroom in a rooming house and proceeded to the second floor. From the hallway, the officer stood on a chair and peered into the transom above the door to defendant's room and saw gambling paraphernalia. As a result, the officer entered the room and arrested the defendant. In finding the resulting arrest illegal, as without a prior warrant, the court said:
"We are not dealing with formalities. The presence of a search warrant serves a high function. Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police. This was done not to shield criminals nor to make the home a safe haven for illegal activities. It was done so that an objective mind might weigh the need to invade that privacy in order to enforce the law. The right of privacy was deemed too precious to entrust to the discretion of those whose job is the detection of crime and the arrest of criminals.... And so the Constitution requires a magistrate to pass on the desires of the police before they violate the privacy of the home. We cannot be true to that constitutional requirement and excuse the absence of a search warrant without a showing by those who seek exemption from the constitutional mandate that the exigencies of the situation made that course imperative."
335 U.S. at 455-56, 69 S.Ct. at 193. The McDonald court was careful not to invalidate the arrest simply because the officer broke into the landlady's room without any consent or invitation to do so. The Court also placed no weight on the fact that the officer was in a "common area", the hallway, when he spied into the transom and first saw evidence of a crime.
Justice Jackson added a further explanation in a concurring opinion in McDonald:
"the officer in charge of the investigation took the matter into his own hands. He neither had nor sought a search warrant or warrant of arrest; he did not then have knowledge of a crime sufficient, even in his own opinion, to justify arrest, and he did not even know that the suspect, McDonald, was in the rooming house at the time. Nevertheless, he forced open the window of the landlady's bedroom and climbed in. He apparently was in plain clothes but showed his badge to the frightened woman, brushed her aside and then unlocked doors and admitted two other officers. They then went to the hall outside the room rented and occupied by defendant. The officer in charge climbed on a chair and looked through a transom. Seeing the defendant McDonald engaged in activity which he considered to be part of the lottery procedure, he arrested him and searched the quarters. The Government argued, and the court below held, that since the forced entry into the building was through the landlady's window, in a room in which the defendant as a tenant had no rights, no objection to this mode of entry or to the search that followed was available to him.
"Doubtless a tenant's quarters in a rooming or apartment house are legally as well as practically exposed to lawful approach by a good many persons without his consent or control. Had the police been admitted as guests of another tenant or had the approaches been thrown open by an obliging landlady or doorman, they would have been legally in the hallways. Like any other stranger, they could then spy or eavesdrop on others without being trespassers. If they peeped through the keyhole or climbed on a chair or on one another's shoulders to look through the transom, I should see no grounds on which the defendant could complain. If in this manner they, or any private citizen, saw a crime in the course of commission, an arrest would be permissible.
"But it seems to me that each tenant of a building, while he has no right to exclude from the common hallways those who enter lawfully, does have a personal and constitutionally protected interest in the integrity and security of the entire building against unlawful breaking and entry." [emphasis supplied]
335 U.S. 451, 457-458, 69 S.Ct. 191, 194-95 (Jackson, J. concurring).
We glean from McDonald and the foregoing decisions an inflexible rule that, unless the case involves a recognized exception *1262 to the warrant requirement, the Fourth Amendment bars a police officer from simply walking into a home and searching for evidence of criminal conduct by its inhabitants. Recurring to the Court's explanation in Chimel, the mere fact that an officer is given information by another citizen,[6] "however well founded, that an article sought is concealed in a dwelling house, furnishes no justification for a search of that place without a warrant." 395 U.S. at 762, 89 S.Ct. at 2039. In other words, even with probable cause to believe that a residence contains evidence of a crime, the rule is that a warrant is required before the police may enter without consent.
It is important to note that the state does not assert, and there is no evidence to suggest, any established exception to the warrant requirement. This is not a case involving motor vehicles. Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970) (warrant not required for search of movable vehicle). Nor do we confront exigent circumstances such as, for example, the imminent and likely destruction of evidence of a crime in progress. Warden, Md. Penitentiary v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967) (where police were informed that armed robbery had taken place and that suspect had entered certain house less than five minutes before they reached it, officers acted reasonably when they entered house and began to search for man whose description they had been given and for weapons which he had used in robbery or might use against them and neither entry without warrant to search for robber nor search for him without warrant was invalid). Moreover, this is not a case of a search incident to a lawful arrest. See Vale v. Louisiana, 399 U.S. 30, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970) (search of house incident to lawful arrest not valid where arrest took place outside house on steps before defendant could enter). Finally, there is no suggestion of immediate peril or harm to persons within. See generally 3 Wayne R. LaFave, SEARCH AND SEIZURE, (3rd ed.) § 6.5(d).
Since McDonald, several courts have addressed the question whether there is Fourth Amendment protection for the tenants of a rooming house when the officer enters common areas without the consent of a resident. In United States v. Carriger, 541 F.2d 545 (6th Cir.1976), where the officer slipped into the building by holding a locked door open after some workmen left the premises, the court invalidated the arrest, saying:
"We cannot agree with the district court that McDonald may be distinguished upon the basis that it proscribed a forcible entry into an apartment building while the entry here was peaceable. Whether the officer entered forcibly through a landlady's window or by guile through a normally locked entrance door, there can be no difference in the tenant's subjective expectation of privacy, and no difference in the degree of privacy that the Fourth Amendment protects. A tenant expects other tenants and invited guests to enter in the common areas of the building, but he does not except trespassers."
541 F.2d at 551. A number of appellate courts have agreed with the rationale of Mc-Donald and Carriger. See, e.g., Reardon v. Wroan, 811 F.2d 1025 (7th Cir.1987); United States v. Booth, 455 A.2d 1351 (D.C.App. 1983); People v. Trull, 64 Ill.App. 3d 385, 20 Ill.Dec. 960, 380 N.E.2d 1169 (1978); State v. Di Bartolo, 276 So.2d 291 (La.1973); Garrison v. State, 28 Md.App. 257, 345 A.2d 86 (1975); People v. Beachman, 98 Mich.App. 544, 296 N.W.2d 305 (1980). On the other hand, the weight of authority among the federal appellate courts has rejected the Carriger analysis of McDonald. See, United States v. Nohara, 3 F.3d 1239 (9th Cir.1993); United States v. Barrios-Moriera, 872 F.2d 12 (2nd Cir.1989), cert. denied, 493 U.S. 953, 110 S.Ct. 364, 107 L.Ed.2d 350 (1989); United States v. Holland, 755 F.2d 253 (2nd Cir.1985), cert. denied, 471 U.S. 1125, 105 *1263 S.Ct. 2657, 86 L.Ed.2d 274 (1985); United States v. Luschen, 614 F.2d 1164 (8th Cir. 1980), cert. denied, 446 U.S. 939, 100 S.Ct. 2161, 64 L.Ed.2d 793 (1980);United States v. Eisler, 567 F.2d 814 (8th Cir.1977); see also 1 Wayne R. LaFave, SEARCH AND SEIZURE (3rd ed.) § 2.3(b) at 477-478.
Our state constitution requires that the right to be free from unreasonable searches and seizures be construed:
"in conformity with the 4th Amendment to the United States Constitution, as interpreted by the United States Supreme Court. Articles or information obtained in violation of this right shall not be admissible in evidence if such articles or information would be inadmissible under decisions of the United States Supreme Court construing the 4th Amendment to the United States Constitution."
Art. I, § 12, Fla. Const. (as amended 1982). Moreover, a Florida District Court of Appeal takes its direction on matters of federal constitutional law first from the United States Supreme Court and, in the absence of definitive precedent from that Court, from the Florida Supreme Court. See State v. Dwyer, 332 So.2d 333 (Fla.1976) (the only federal decisions binding upon the Florida state courts are those of the United States Supreme Court); Board of County Comm'rs v. Dexterhouse, 348 So.2d 916 (Fla. 2nd DCA 1977) (same); Brown v. Jacksonville, 236 So.2d 141 (Fla. 1st DCA 1970) ("A decision of a Federal District Court, while persuasive if well reasoned, is not by any means binding on the courts of a state. The Supreme Court of Florida is the apex of the judicial system of the State of Florida, and its decisions are binding upon this court.").
Our supreme court has been no less assiduous in protecting the home from warrantless entry by police. In Dickens v. State, 59 So.2d 775 (Fla.1952), our court flatly held:
"When an arresting officer enters one's back door for the purpose of searching the premises and to make an arrest without a search warrant he is little more than a trespasser."
Just a few years later, in Benefield v. State, 160 So.2d 706 (Fla.1964), Justice Terrell explained why the constitution bars police officers from simply walking into a person's home and searching for evidence of a crime:
"Entering one's home without legal authority and neglect to give the occupants notice have been condemned by the law and the common custom of this country and England from time immemorial. It was condemned by the yearbooks of Edward IV, before the discovery of this country by Columbus.... William Pitt categorized a man's home as his castle. Paraphrasing one of his speeches in which he apostrophized the home, it was said in about this fashion: The poorest pioneer in his log cabin may bid defiance to the forces of the crown. It may be located so far in the backwoods that the sun rises this side of it; it may be unsteady; the roof may leak; the wind may blow through it; the cold may penetrate it and his dog may sleep beneath the front steps, but it is his castle that the king may not enter and his men dare not cross the threshold without his permission.
"This sentiment has moulded our concept of the home as one's castle as well as the law to protect it. The law forbids the law enforcement officers of the state or the United States to enter before knocking at the door, giving his name and the purpose of his call. There is nothing more terrifying to the occupants than to be suddenly confronted in the privacy of their home by a police officer decorated with guns and the insignia of his office. This is why the law protects its entrance so rigidly. The law so interpreted is nothing more than another expression of the moral emphasis placed on liberty and the sanctity of the home in a free country. Liberty without virtue is much like a spirited horse, apt to go berserk on slight provocation if not restrained by a severe bit."
160 So.2d at 708-709. We read these state cases to be entirely harmonious with the United States Supreme Court decisions discussed.
Applying these principles to the present case, especially as applied in McDonald, we hold that the officer's entry into the back entrance and corridor of this rooming house was improper in the absence of either a *1264 search warrant or consent by one of the occupants. The absence of locks or even doors on the entrances does not change the character of the building from a residence. Nor does the fact that several unrelated people had their residences in one building weaken its status as a house or dwelling. The privacy of residential premises does not arise from the nature of the security devices employed to keep unwanted intruders out. Rather, it derives from the very nature of the use as a residence  whether the occupants be one or many, related or unrelated. The security of locks and doors may be vital in a society where thugs and thieves prey on the unwitting and unable, but the importance of such security devices for personal safety hardly makes them a constitutional necessity for purposes of search and seizure. Locks may undeniably evidence an expectation of privacy in another place where the expectation of privacy may fairly and reasonably be open to question, but their lack does not erode the high protection our Constitution affords to those special places in which people reside.
Nor does the presence of visitors in the kitchen change the character of the building from a residence into a public building. In the latter part of the 20th century, kitchens have become places to gather and converse with friends, neighbors and acquaintances. That we may allow some neighbors to wander in and out of our kitchens, however, does not turn them into public areas open to police. Nor does the fact that this company was described as being "from off the street" convert the kitchen into a 19th century village commons. A gathering place in one's home is just that: a place within a home, and it is entitled to the same protection as the home itself. People may suffer some of their neighbors into the kitchens within their homes without connoting thereby any general invitation to the police.
It is also indisputable that, even if this rooming house lacked doors and locks, it was clearly surrounded by a fence. That some people were allowed to come inside the fence and into the kitchen does not eliminate the fact of the fence. The evidence was uncontradicted that the house was for the tenants only and those guests they either invited or suffered. No consent for the state to enter at will can be drawn from the mere fact that the residents or owners were too poor to afford secure doors and locks on the entrances, or from the fact that the officer could see through one entrance down the corridor and out the other. The winds of subtropical Florida may course through this home  which is apparently as a matter of comfort or necessity open to the air  but that scarcely means that the police can do so as well.
For that reason, we think the trial judge read too much into the testimony of Ms. Hudson regarding the presence of the visitors on the day in question. We repeat: Ms. Hudson did not testify that none of the other tenants  or even the owner  had given any of them permission to be there at that time. The fact that the premises were operated as a rooming house does not justify a conclusion, from the mere presence of this company who did not establish explicit consent to be there, that the premises were therefore open to the public. In other words, the inference drawn by the finder of fact was impermissible because it was not reasonably suggested by the proven fact from which the inference was drawn.
The trial judge said that he read State v. Batista, 524 So.2d 481 (Fla. 3d DCA 1988), to hold that "no resident of the unlocked, and unsecured premises in [an] apartment building in the present case could have had a reasonable expectation [of privacy] in those shared areas." Batista did not explain how the officers came to enter into the apartment building except as follows:
"Contrary to the trial court's view, it is legally inconsequential  although perhaps emotionally provocative  that the seizing police officers entered the grounds of the thirty-unit apartment building by scaling a six-foot high wall at the rear of the property, since it plainly appears from a fair reading of the record that the general public had unimpeded access to the building through the front entrance to the property."
524 So.2d at 482. We can probably safely assume, however, that when the officers entered *1265 the building they did not have probable cause. In any event, the decision does seem to stand for the proposition that in an apartment building a tenant's expectation of privacy in the common areas turns on how secure the entrance to the building is. Of course, today's case involves a rooming house rather than an apartment building. To the extent, however, that our decision conflicts with Batista, we certify conflict.
We reverse the order denying suppression and the following conviction for proceedings consistent with our disposition.
REVERSED.
GLICKSTEIN and GROSS, JJ., concur.
NOTES
[1] Ms. Hudson testified that she was a visitor to the rooming house on the day in question but that she had formerly lived there and knew the owner.
[2] Justice Harlan also succinctly said: "[t]hus a man's home is, for most purposes, a place where he expects privacy..." Katz v. United States, 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring).
[3] "The [Fourth] Amendment was in large part a reaction to the general warrants and warrantless searches that had so alienated the colonists and had helped speed the movement for independence." Chimel v. California, 395 U.S. 752, 761, 89 S.Ct. 2034, 2039, 23 L.Ed.2d 685 (1969).
[4] Judge Frank summed up the core Fourth Amendment protection for the home thus:

"I believe that, under the [Fourth] Amendment, the `sanctity of a man's house and the privacies of life' still remain protected from the uninvited intrusion.... A man can still control a small part of his environment, his house; he can retreat thence from outsiders, secure in the knowledge that they cannot get at him without disobeying the Constitution. That is still a sizable hunk of liberty  worth protecting from encroachment. A sane, decent, civilized society must provide some such oasis, some shelter from public scrutiny, some insulated enclosure, some enclave, some inviolate place  which is a man's castle."
United States v. On Lee, 193 F.2d 306, 315-316 (2nd Cir.1952), cert. granted, 342 U.S. 941, 72 S.Ct. 560, 96 L.Ed. 700 (1952), (Frank, J., dissenting).
[5] The state argues that the legislature treats rooming houses differently for purposes of search warrants. Section 933.18(8), Florida Statutes (1995) (search warrant may not be issued to search private, occupied dwelling unless dwelling is used in part for business purpose such as "hotel, or boardinghouse, or lodginghouse" [emphasis supplied]). We can assume that the rooming house in question fits within the statutory terms "boardinghouse or lodginghouse." By its clear terms, however, the statute applies only to search warrants, and the lack of a warrant is essentially the issue in the present case. Indeed so far as the statute might conceivably be applicable to the present case, it suggests that without the warrant police entry onto the premises is unauthorized.
[6] Our recent decision in State v. Evans, 692 So.2d 216 (Fla. 4th DCA 1997), is inapplicable. That case involved the reliability of a tip from a citizen-informant as a basis for an investigatory stop which led to an arrest for drunk driving at a drive-in restaurant. In the absence of exceptional circumstances to dispense with the necessity of a search warrant, the inherent reliability of citizen-informants provides no justification to dispense with the necessity of a warrant to search a house, any more than probable cause does.