707 So.2d 706 (1998)
STATE of Florida, Petitioner,
v.
Johnny TITUS, Respondent.
No. 91065.
Supreme Court of Florida.
March 5, 1998.
*707 Robert A. Butterworth, Attorney General, Tallahassee; Celia Terenzio, Bureau Chief, and Barbra Amron Weisberg and Sarah B. Mayer, Assistant Attorneys General, West Palm Beach, for Petitioner.
Richard L. Jorandby, Public Defender, and Louis G. Carres and Marcy K. Allen, Assistant Public Defenders, Fifteenth Judicial Circuit, West Palm Beach, for Respondent.
GRIMES, Senior Justice.
We have for review Titus v. State, 696 So.2d 1257 (Fla. 4th DCA 1997), in which the Fourth District Court of Appeal certified conflict with State v. Batista, 524 So.2d 481 (Fla. 3d DCA 1988). We have jurisdiction. See art. V, § 3(b)(4), Fla. Const.
At issue here is whether the common living areas within rooming houses should be accorded the same Fourth Amendment protection extended to the interior of private homes.[1] With limited exception not present here, we hold that rooming houses should be accorded such Fourth Amendment protection, and approve the decision below.
The underlying facts are as follows: A citizen told a police officer that someone was smoking narcotics in a nearby two-story house. The officer knew the house was a rooming house. Without first obtaining a search warrant or consent, he entered the house through a side gate (the property was fenced) and a back entrance. The testimony was conflicting over whether the back entrance was doorless, but the residents kept their individual rooms locked. The officer proceeded through a corridor to the common-area kitchen, where several people had gathered. Some of these persons were neither residents nor guests thereof but who, according to unelaborated testimony, "just came in off the street." The officer observed rooming house resident Titus, who was placing a pipe into his pocket, and an invited guest, who was smoking crack cocaine through a pipe.
Titus was arrested and charged with possession of cocaine and drug paraphernalia, to which he originally pled not guilty. He challenged the constitutionality of the search through a suppression motion, which the trial court denied under the plain view doctrine upon finding that "there was no security on the doors ... [and] there were persons in the kitchen, who were neither invited guests, nor tenants ... [and, therefore, the officer,] as any other member of the public in the area, apparently could have come into the ... rooming house into the common areas." In so holding, the trial court substantially relied upon State v. Batista, 524 So.2d 481, 482 (Fla. 3d DCA 1988), in which the Third District Court of Appeal held that a resident of the unlocked and unsecured premises of an apartment building does not have a reasonable expectation of privacy in the hallways or other shared areas. Titus thereafter pled no contest and was convicted of the charges, but reserved the right to appeal the denial of his suppression motion.
After exhaustively discussing both federal and state law in this area, the Fourth District Court of Appeal reversed, holding that "the officer's entry into the back entrance and corridor of this rooming house was improper in the absence of either a search warrant or consent by one of the occupants." Titus v. State, 696 So.2d 1257, 1263-64 (Fla. 4th DCA 1997). While distinguishing Batista as involving an apartment building, the court nevertheless certified conflict with that case, which it described as "seem[ing] to stand for the proposition that in an apartment building a tenant's expectation of privacy in the common areas turns on how secure the entrance to the building is." Titus, 696 So.2d at 1265.
The State now essentially argues, as it did below, that the search did not offend Fourth Amendment principles because Titus had no reasonable expectation of privacy in the common hallway and kitchen.[2] Titus counters by *708 emphasizing the character of the rooming house as a dwelling, arguing that "merely because the residents lack total privacy within the dwelling to each have a private kitchen, and hallways within the dwelling are necessary to traverse between their bedroom and their kitchen[,] does not defeat the essential nature of the interior hallways or kitchen as part of their private dwelling."
Upon consideration, we agree with Titus. The Fourth Amendment establishes "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures...." U.S. Const. amend. IV (emphasis added). Indeed, "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed," United States v. United States District Court, 407 U.S. 297, 313, 92 S.Ct. 2125, 2134-35, 32 L.Ed.2d 752 (1972), and "[a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." Silverman v. United States, 365 U.S. 505, 511, 81 S.Ct. 679, 682-83, 5 L.Ed.2d 734 (1961).
It is this concept of "home," so sacrosanct under Fourth Amendment law, that guides our decision today. The mere fact that certain rooms traditionally associated with a home are shared by rooming house residents does not render the structure any less a home to those residents. See, e.g., McDonald v. United States, 335 U.S. 451, 453-56, 69 S.Ct. 191, 192-94, 93 L.Ed. 153 (1948) (applying Fourth Amendment protections of the home to rooming house in reversing denial of suppression motion where warrantless police climbed through landlady's window and proceeded to hallway where they observed illegal activity in defendant's room by standing on chair and looking through transom);[3]id. at 458, 69 S.Ct. at 194 ("[E]ach tenant of a building, while he has no right to exclude from the common hallways those who enter lawfully, does have a personal and constitutionally protected interest in the integrity and security of the entire building against unlawful breaking and entry.") (Jackson, J., concurring); Brown v. United States, 83 F.2d 383, 386 (3d. Cir.1936) ("[Certain of the appellants] were roomers in the house. It was their home and so far as the unlawful search affected them, it violated their constitutional rights."); United States v. Booth, 455 A.2d 1351, 1353-54 (D.C.1983) (rejecting government's argument that because appellees lived in a rooming house, as opposed to a private home, they lacked a legitimate expectation of privacy in the front hall where police made warrantless entry); People v. Garriga, 189 A.D.2d 236, 596 N.Y.S.2d 25, 28 ("[W]e believe that the officers here, by entering the internal hallways of the defendant's rooming house to find him engaged in a criminal transaction, entered the defendant's home in a constitutional sense."), leave to appeal denied, 82 N.Y.2d 718, 602 N.Y.S.2d 815, 622 N.E.2d 316 (1993).
We therefore hold as a matter of law that (1) just like private homeowners, rooming house residents have an actual expectation of privacy in the common areas of the rooming house and that (2) given the sanctity of the home, society is prepared to recognize that expectation as reasonable. See Katz v. United States, 389 U.S. 347, 361, 88 S.Ct. 507, 516-17, 19 L.Ed.2d 576 (1967)(setting forth two-part test)(Harlan, J., concurring).[4] *709 Of course, this would not be the case if the rooming house in question was obviously open to the general public. See, e.g., City of Evanston v. Hopkins, 330 Ill.App. 337, 71 N.E.2d 209 (1947) (abstract)(police entry into rooming house upheld where there was a "Public Telephone" sign at entrance and door was open). However, there was insufficient proof that the rooming house in this case was open to the general public. As noted by the Fourth District Court of Appeal below:
[Nobody] testified that the house or kitchen is open to the public generally, or that the general public is permitted to enter the premises without restraint....
....
[T]he presence of visitors in the kitchen [does not] change the character of the building from a residence into a public building. In the latter part of the 20th century, kitchens have become places to gather and converse with friends, neighbors and acquaintances. That we may allow some neighbors to wander in and out of our kitchens, however, does not turn them into public areas open to police. Nor does the fact that this company was described as being "from off the street" convert the kitchen into a 19th century village commons. A gathering place in one's home is just that: a place within a home, and it is entitled to the same protection as the home itself. People may suffer some of their neighbors into the kitchens within their homes without connoting thereby any general invitation to the police.
....
...[W]e think the trial judge read too much into the testimony ... regarding the presence of the visitors on the day in question. We repeat: [the subject witness] did not testify that none of the other tenants or even the ownerhad given any of them permission to be there at that time. The fact that the premises were operated as a rooming house does not justify a conclusion, from the mere presence of this company who did not establish explicit consent to be there, that the premises were therefore open to the public. In other words, the inference drawn by the finder of fact was impermissible because it was not reasonably suggested by the proven fact from which the inference was drawn.
Titus, 696 So.2d at 1258-64; see Bryant v. United States, 599 A.2d 1107, 1109 (D.C.1991)(police knowledge that residence was a rooming house not enough to support inference that public access was freely permitted and that residents held no privacy interests in common areas worthy of society's protection); see also, e.g., id. at 1110 (where police officers entered rooming house through wide-open front door and passed through hallway, kitchen, and stairway to basement corridor where they arrested rooming house resident, resident had legitimate expectation of privacy in those areas where there was no indication they were open to the general public); United States v. Booth, 455 A.2d 1351, 1354 (D.C.1983) (holding that rooming house residents had "a legitimate expectation of privacy in the front hallway of the house they shared, which was not obviously a rooming house open to the general public"); People v. Douglas, 2 Cal. App.3d592, 82 Cal.Rptr. 718, 720 (1969)("[A]lthough defendant [a rooming house resident] could reasonably expect to have his privacy invaded by one of the other roomers or his guests, the kitchen and bathroom were not open to others. The area entered could not be regarded as a `relatively public' place."); State v. Berlow, 284 N.J.Super 356, 665 A.2d 404, 405 (Ct. Law Div.1995)(mere description of premises as "rooming house" did not establish lack of expectation of privacy in common areas absent evidence that such areas were open to the public or anyone other than residents).
Nor does the fact that the external rooming house doors were either open or nonexistent render the rooming house open to the general public. As held by the Fourth District Court below:
[N]o one testified that the absence of locked doors at the entrances was intended *710 as an invitation to the public to enter at will....
....
... The absence of locks or even doors on the entrances does not change the character of the building from a residence.... The privacy of residential premises does not arise from the nature of the security devices employed to keep unwanted intruders out. Rather, it derives from the very nature of the use as a residence whether the occupants be one or many, related or unrelated. The security of locks and doors may be vital in a society where thugs and thieves prey on the unwitting and unable, but the importance of such security devices for personal safety hardly makes them a constitutional necessity for purposes of search and seizure. Locks may undeniably evidence an expectation of privacy in another place where the expectation of privacy may fairly and reasonably be open to question, but their lack does not erode the high protection our Constitution affords to those special places in which people reside.
....
It is also indisputable that, even if this rooming house lacked doors and locks, it was clearly surrounded by a fence. That some people were allowed to come inside the fence and into the kitchen does not eliminate the fact of the fence. The evidence was uncontradicted that the house was for the tenants only and those guests that they either invited or suffered. No consent for the state to enter at will can be drawn from the mere fact that the residents or owners were too poor to afford secure doors and locks on the entrances, or from the fact that the officer could see through one entrance down the corridor and out the other. The winds of subtropical Florida may course through this homewhich is apparently as a matter of comfort or necessity open to the airbut that scarcely means that the police can do so as well.
Titus, 696 So.2d at 1259-64; see Bryant, 599 A.2d at 1110 ("Appellant testified that sometimes the front door was left openas on this late June occasionand at other times it was locked. We cannot infer merely from this that the tenants took no `reasonable precautions in attempting to maintain privacy.' "); State v. Sakellson, 379 N.W.2d 779, 782 (N.D.1985)("Whether a door is open through simple inadvertence or design, it should not subject an occupant to the unannounced entry of the uninvited. Simply because one forgot, or purposefully failed to close a door, does not create a reasonable expectation of an uninvited, unannounced entry.").
Furthermore, we agree with the court in Garriga that in addition to the considerations discussed above,
[t]here is too, in our view, importance on another level in finding the common internal hallway area of a rooming house a private, as opposed to a public, place, which arises from our obligation as judges to construe and vindicate constitutional safeguards in a class-neutral manner. Clearly, it is economic necessity that requires those who live in such humble circumstances to dwell there. That they cannot afford to have their own kitchens and bathrooms, and hallway access thereto, does not render such areas "public" with respect to the constitutional prerequisites for permissible entry by the police
.... We should vigilantly guard against permitting ... inroads upon the reasonable expectations of privacy of the lesser situated of our citizens who are forced by economic circumstances to reside in rooming houses.
People v. Garriga, 189 A.D.2d 236, 596 N.Y.S.2d 25, 29 (citation omitted), leave to appeal denied, 82 N.Y.2d 718, 602 N.Y.S.2d 815, 622 N.E.2d 316 (1993).
We are aware that other courts have reached a contrary result on this issue. See, e.g., United States v. Anderson, 533 F.2d 1210, 1214 (D.C.Cir.1976)(holding that defendant's constitutionally protected privacy interest began at the door to his room, not at the door to the rooming house); United States v. Perkins, 286 F.Supp. 259, 264 (D.D.C.1968)("It would serve no purpose to require officers to knock on ... rooming house ... doors, when their mission is to one of the ... rooms inside."), aff'd, 432 F.2d 612 *711 (D.C.Cir.), cert. denied, 400 U.S. 866, 91 S.Ct. 108, 27 L.Ed.2d 106 (1970); State v. Kechrid, 822 S.W.2d 552, 555 (Mo.Ct.App.1992) ("[W]e conclude that [the subject boarding house resident] did not have a reasonable expectation of privacy in the hallway, and [the subject officer] had a legitimate reasoncrime investigationto be on the premises."). However, in the final analysis, and with the cherished concept of "home" as our polestar, we approve the decision below and hold that the internal common living areas of rooming houses not open to the public should be accorded the same Fourth Amendment protection extended to the interiors of private homes.
This holding does not extend to common hallways in unlocked apartment buildings, which generally serve only to connect separate, self-contained living units typically complete with all of the traditional living areas (i.e., bathrooms, dining rooms, living rooms, kitchens, etc.). Interior hallways in rooming houses are protected only by virtue of linking such traditional rooms within the housethey provide rooming house residents with the only means of access to these rooms, and are an inseparable feature of their "home." In other words, it is not any inherent nature of a hallway that controls, but rather what the hallway links (i.e., individual self-contained living units versus shared traditional living areas). We therefore agree with the statement in Batista that "even assuming, arguendo, that a resident... may have a reasonable expectation of privacy in the common entries, hallways, and spaces of a locked or otherwise secured apartment building, no resident of the unlocked and unsecured premises [of the] apartment building in the present case could have had such a reasonable expectation in those shared areas." State v. Batista, 524 So.2d 481, 482 (Fla. 3d DCA 1988) (citations omitted).
Accordingly, we find Batista to be factually and legally distinguishable, and we approve the decision below.
It is so ordered.
KOGAN, C.J., and OVERTON, SHAW, HARDING, WELLS and ANSTEAD, JJ., concur.
NOTES
[1] This opinion is limited to interior areas of rooming houses, and neither addresses nor extends to exterior areas (i.e., curtilage) of rooming houses.
[2] The State does not contend that the officer was acting under exigent circumstances.
[3] As noted by the Fourth District Court of Appeal below:

The McDonald court was careful not to invalidate the arrest simply because the officer broke into the landlady's room without any consent or invitation to do so. The Court also placed no weight on the fact that the officer was in a "common area", the hallway, when he spied into the transom and first saw evidence of a crime.
Titus, 696 So.2d at 1261.
[4] As stated by Professor LaFave:

Katz teaches that the [Fourth] Amendment "protects people, not places," and that the "constitutionally protected area" concept cannot "serve as a talismanic solution to every Fourth Amendment problem." But even under the Katz justified-expectation-of-privacy approach, it is still useful to view residential premises as a place especially protected against unreasonable police intrusion. As Justice Harlan noted in his concurring opinion in Katz, "reference to a `place'" is ordinarily necessary in deciding what protection the Fourth Amendment affords people. And it is still true, he added, that "a man's home is, for most purposes, a place where he expects privacy."
1 Wayne R. LaFave, Search and SeizureA Treatise on the Fourth Amendment § 2.3, at 465 (3d ed.1996).