FARMER, J.,
dissenting.
Two state citrus inspectors were searching for evidence of trees infected with citrus canker. At the subject premises they saw that the property had a fence around it and that the entrance was locked. After the owner refused them permission to enter without a warrant, they pushed their way into the man’s property, called a deputy sheriff who actually arrested the owner, and placed him in the locked rear seat of the unopened police car. The inspectors then removed part of the fence, dismantled the gate, cut down three trees, ground the stumps into mulch, and patched together the remnants of the fence and gate. The deputy transported the owner to the police station for formal criminal charges that were later dismissed. The owner has since sued all of them for damages, but these state officials convinced a trial judge that his case should be thrown out without a trial because of their claim to immunity from any liability.
The majority find the immunity in a state statute merely defining the general duties of citrus inspectors.[2] They hold that state officials reading the statute might reasonably have entertained good faith doubts about the applicability of United States Supreme Court holdings requiring state administrative agents to have properly issued search warrants in order to enter private residences and make public health and safety inspections. The Court thus brushes aside two Supreme Court precedents, Camara v. Municipal Court of City and County of San Francisco, 387 U.S. 623, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967), and See v. City of Seattle, 387 U.S. 541, 87 S.Ct. 1741, 18 L.Ed.2d 930 (1967), as though the Florida Legislature *654 were free to overrule the considered decisions of our Nation’s highest court.
These cases fixed the rule that the Fourth Amendment requires state and local agencies to have search warrants to make non-criminal, regulatory inspections of a person’s home and property. In fact, these cases specifically rejected the very rationale used in this case for the claim of immunity. Camara and See explicitly decided that general statutory grants of authority to state agencies to enter private homes for health and safety regulatory inspections, as here, cannot be used to justify warrantless entry. For these reasons, I would reverse.
“[Pjhysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.” United States v. United States District Court, 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972); see also State v. Titus, 707 So.2d 706, 708 (Fla.1998) (quoting same). “Without question, the home is accorded the full range of Fourth Amendment protections.” Lewis v. United States, 385 U.S. 206, 210, 87 S.Ct. 424, 17 L.Ed.2d 312 (1967).
The Supreme Court has made clear that “[t]he Fourth Amendment, and the personal rights which it secures, have a long history. At the very core stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.” Silverman v. United States, 365 U.S. 505, 511, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961). In memorable words:
“ ‘The maxim that ‘every man’s house is his castle’ is made a part of our constitutional law in the clauses prohibiting unreasonable searches and seizures, and has always been looked upon as of high value to the citizen.’ ... ‘[N]o man’s house can be forcibly opened, or he or his goods be carried away after it has thus been forced, except in cases of felony; and then the sheriff must be furnished with a warrant, and take great care lest he commit a trespass. This principle is jealously insisted upon ... ’.”
Weeks v. United States, 232 U.S. 383, 390-91, 34 S.Ct. 341, 58 L.Ed. 652 (1913). The Court has even added a clear explanation as to why warrants are required for searches of homes:
“The presence of a search warrant serves a high function. Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police. This was done not to shield criminals nor to make the home a safe haven for illegal activities. It was done so that an objective mind might weigh the need to invade that privacy in order to enforce the law. The right of privacy was deemed too precious to entrust to the discretion of those whose job is the detection of crime and the arrest of criminals.... And so the Constitution requires a magistrate to pass on the desires of the police before they violate the privacy of the home. We cannot be true to that constitutional requirement and excuse the absence of a search warrant without a showing by those who seek exemption from the constitutional mandate that the exigencies of the situation made that course imperative.”
McDonald v. United States, 335 U.S. 451, 455-56, 69 S.Ct. 191, 93 L.Ed. 153 (1948); see also Chimel v. California, 395 U.S. 752, 762, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969) (“requirement that a search warrant be obtained is not lightly to be dispensed with, and ‘the burden is on those seeking [an] exemption [from the requirement] to show the need for it ... ’.”) (reemphasizing holdings in Agnello v. United States, 269 U.S. 20, 33, 46 S.Ct. 4, 70 L.Ed. 145 (1925) and United States v. Jeffers, 342 U.S. 48, 51, 72 S.Ct. 93, 96 L.Ed. 59 (1951))
*655 In Benefield v. State, 160 So.2d 706 (Fla.1964), the Florida Supreme Court also emphatically adopted for this State the same principle, according the home the highest degree of constitutional protection, saying:
“Entering one’s home without legal authority and neglect to give the occupants notice have been condemned by the law and the common custom of this country and England from time immemorial.... Paraphrasing one of his speeches in which [William Penn] apostrophized the home, it was said in about this fashion:
The poorest pioneer in his log cabin may bid defiance to the forces of the crown. It may be located so far in the backwoods that the sun rises this side of it; it may be unsteady; the roof may leak; the wind may blow through it; the cold may penetrate it and his dog may sleep beneath the front steps, but it is his castle that the king may not enter and his men dare not cross the threshold without his permission.
... The law so interpreted is nothing more than another expression of the moral emphasis placed on liberty and the sanctity of the home in a free country.”
160 So.2d at 708-09. More recently in Titus, the supreme court reemphasized the same principle, saying that “[i]t is this concept of ‘home,’ so sacrosanct under Fourth Amendment law, that guides our decision today.” 707 So.2d at 708. In this instance, both supreme courts speak as one about the high priority placed on the privacy of the home and the unyielding necessity for a warrant as a basis for government entry.
These holdings recite an old, essential truth indispensable to this country’s basic structure. The State and its officers are charged with knowing that the home is the citadel of every citizen. They are held to an understanding that without a warrant the government may not enter ,a home unless the person gives leave to do so. This is not a complex thought, one taxing the comprehension of government agents. It requires no intricate analysis or explanation to grasp. The simple rule is that if for any reason the government wants to go onto a citizen’s property to inspect its contents it needs a warrant granting authority to do so.
Camara could not be clearer. Yet the court today summarily waves Camara aside, apparently crediting the inspectors’ assertion of doubts caused 'by section 581.081 over the clarity of Camara’s broad general holding about non-criminal, administrative inspections of private property. Camara opened with the following explanation of what the Court had decided to review:
“In Frank v. State of Maryland, 859 U.S. 360, 79 S.Ct. 804, 3 L.Ed.2d 877, Court upheld, by a five-to-four vote, a state court conviction of a homeowner who refused to permit a municipal health inspector to enter and inspect his premises without a search warrant. In Ohio ex rel. Eaton v. Price, 364 U.S. 263, 80 S.Ct. 1463, 4 L.Ed.2d 1708, a similar conviction was affirmed by an equally divided Court. Since those closely divided decisions, more intensive efforts at all levels of government to contain and eliminate urban blight have led to increasing use of such inspection techniques, while numerous decisions of this Court have more fully defined the Fourth Amendment’s effect on state and municipal action. In vieiu of the growing nationwide importance of the problem, we npted probable jurisdiction in this case and in See v. City of Seattle, 387 U.S. 541, [87 S.Ct. 1737, 18 L.Ed.2d 943], to re-examine whether administrative inspection programs, as presently *656 authorized and conducted, violate Fourth Amendment rights as those rights are enforced against the States through the Fourteenth Amendment.” [e.s.]
387 U.S. at 525, 87 S.Ct. 1727. It is important to perceive that the Court was addressing not simply the San Francisco health inspection at issue in that case but, as the Court said, “whether administrative inspection programs, as presently authorized and conducted, violate Fourth Amendment rights.” 387 U.S. at 525.
At issue in Camara was a health and safety inspection of a private residential apartment unit by a city inspector. In finding that a warrantless entry of an administrative. inspector was a violation of settled Fourth Amendment law, the court explained:
“The basic purpose of this Amendment, as recognized in countless decisions of this Court, is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials. The Fourth Amendment thus gives concrete expression to a right of the people which ‘is basic to a free society.’ ” [e.s.]
387 U.S. at 528, 87 S.Ct. 1727. The Court emphasized that:
“one governing principle, justified by history and by current experience, has consistently been followed: except in certain carefully defined classes of cases, a search of private property without proper consent is ‘unreasonable’ unless it has been authorized by a valid search warrant.” [e.s.]
387 U.S. at 528-29, 87 S.Ct. 1727.
Camara also specifically rejected any notion that warrantless administrative searches of the kind involved in this case are tolerable because the kind of intrusion they represent is less important than criminal searches:
“We may agree that a routine inspection of the physical condition of private property is a less hostile intrusion than the typical policeman’s search for the fruits and instrumentalities of crime.... But we cannot agree that the Fourth Amendment interests at stake in these inspection cases are merely ‘peripheral.’ It is surely anomalous to say that the individual and his private property are fully protected by the Fourth Amendment only when the individual is suspected of criminal behavior.”
387 U.S. at 530, 87 S.Ct. 1727. In describing the use of administrative inspections by governmental authorities, the court noted:
“Under the present system, when the inspector demands entry, the occupant has no way of knowing whether enforcement of the municipal code involved requires inspection of his premises, no way of knowing the lawful limits of the inspector’s power to search, and no way of knowing whether the inspector himself is acting under proper authorization.... [E]ven if the occupant possesses sufficient fortitude to ... risk [refusing entry] ... he may never learn any more about the reason for the inspection than that the law generally allows housing inspectors to gain entry. The practical effect of this system is to leave the occupant subject to the discretion of the official in the field. This is precisely the discretion to invade private property which we have consistently circumscribed by a requirement that a disinterested party warrant the need to search. We simply cannot say that the protections provided by the warrant procedure are not needed in this context; broad statutory safeguards are no substitute for individualized review, particularly when those safeguards may only be *657 invoked at the risk of a criminal penalty.” [e.s., c.o.]
387 U.S. at 532-33, 87 S.Ct. 1727. The highlighted words are critical to the claim of immunity in this case. They make clear that laws generally granting state inspectors the authority to enter any place, including homes, cannot be understood as a dispensation from the warrant requirement. To do so would grant inspectors in the field discretion to invade private property, and the Court has “consistently circumscribed” such grants of discretion. In other words the very justification for constitutional doubts relied on by the majority was explicitly rejected by the Supreme Court forty years ago.
Camara also disposed of the argument that the importance of the particular inspection involved — in that case, a health and safety inspection — would justify inspections without a warrant:
“The final justification suggested for warrantless administrative searches is that the public interest demands such a rule: it is vigorously argued that the health and safety of entire urban populations is dependent upon enforcement of minimum fire, housing, and sanitation standards, and that the only effective means of enforcing such codes is by routine systematized inspection of all physical structures.... But we think this argument misses the mark. The question is not, at this stage at least, whether these inspections may be made, but whether they may be made without a warrant. For example, to say that gambling raids may not be made at the discretion of the police without a warrant is not necessarily to say that gambling raids may never be made.... [T]he question is not whether the public interest justifies the type of search in question, but whether the authority to search should be evidenced by a warrant, which in turn depends in part upon whether the burden of obtaining a warrant is likely to frustrate the governmental purpose behind the search. It has nowhere been urged that fire,health, and housing code inspection programs could not achieve them goals within the confines of a reasonable search warrant requirement. Thus, we do not find the public need argument dispositive.” [e.s., c.o.]
387 U.S. at 533, 87 S.Ct. 1727.
Camara was joined by a companion case, one raising the same Fourth Amendment issues for administrative inspections of commercial property. See v. City of Seattle, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967). The Court there held that even with commercial interests, the Fourth Amendment requires a warrant for administrative inspections. 387 U.S. at 543, 87 S.Ct. 1737. The Court further explained:
“As governmental regulation of business enterprise has mushroomed in recent years, the need for effective investigative techniques to achieve the aims of such regulation has been the subject of substantial comment and legislation. Official entry upon commercial property is a technique commonly adopted by administrative agencies at all levels of government to enforce a variety of regulatory laws; thus, entry may permit inspection of the structure in which a business is housed, as in this case, or inspection of business products, or a perusal of financial books and records. This Court has not had occasion to consider the Fourth Amendment’s relation to this broad range of investigations. However, we have dealt with the Fourth Amendment issues raised by another common investigative technique, the administrative subpoena of corporate books and records. We find strong sup *658 port in these subpoena cases for our conclusion that warrants are a necessary and a tolerable limitation on the right to enter upon and inspect commercial premises.” [e.s., f.o.]
387 U.S; at 543^4, 87 S.Ct. 1737. The Court went on to add:
“It is now settled that, when an administrative agency subpoenas corporate books or records, the Fourth Amendment requires that the subpoena be sufficiently limited in scope,’ relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome. The agency has the right to conduct all reasonable inspections of such documents which are contemplated by statute, but it must delimit the confines of a search by designating the needed documents in a formal subpoena. In addition, while the demand to inspect may be issued by the agency, in the form of an administrative subpoena, it may not be made and enforced by the inspector in the field, and the subpoenaed party may obtain judicial review of the reasonableness of the demand prior to suffering penalties for refusing to comply.” [e.s., f.o.]
387 U.S. at 544-45, 87 S.Ct. 1737. Summing up its holding in See, the Court stated clearly and definitively: •
“We therefore conclude that administrative entry, without consent, upon the portions of commercial premises which are not open to the public may only be compelled through prosecution or physical force within the framework of a warrant procedure. We do not in any way imply that business premises may not reasonably be inspected in many more situations than private homes, nor do we question such accepted regulatory techniques as licensing programs which require inspections prior to operating a business or marketing a product.... We hold only that the basic component of a reasonable search under the Fourth Amendment — that it not be enforced without a suitable warrant procedure— is applicable in this context, as in others, to business as well as to residential premises.” [e.s., f.o.]
387 U.S. at 545-46, 87 S.Ct. 1737. If even commercial property is so protected from warrantless government entry, their can be no doubt about the extent of the protection given private residences.
Although Camara and See involved health and fire inspections, it is clear from the actual text of both that the Court intended their holdings to apply to all state governmental administrative inspections. These holdings were meant to be categorical and generous in application. ’ As the Court pointedly noted, it was addressing “a technique commonly adopted by administrative agencies at all levels of government to enforce a variety of regulatory laws.” 387 U.S. at 544, 87 S.Ct. 1737. Such searches constitute a significant intrusion on protected interests. The holdings apply to all administrative inspections.
The legal propositions settled by these decisions are these. First, grants of state authority to governmental entities generally authorizing governmental officials without a warrant to enter private homes cannot be used to justify warrantless entry. Second, laws generally authorizing government officials without a warrant to enter private property to make inspections deemed to be within the health and safety powers of the state are not sufficient under the Fourth Amendment because such inspections place the citizen at the mercy of the unreviewed discretion of the inspecting official in the field. Third, broad statutory safeguards contained in ordinances authorizing warrantless health and safety inspections of houses and buildings by municipal inspectors are no substitute *659 for individualized review, particularly when such safeguards may be invoked only at the risk of criminal penalty.
Turning to the statute on which the inspectors rely, the important thing to perceive about section 581.031 is what it does not say. Plainly it does not mention or even hint at any dispensation from the requirement of a warrant. This is not a specific statute aimed at providing exceptions from the warrant requirement for administrative searches. The inspectors make no attempt to explain why it would be reasonable — four decades after the clear constitutional holdings in Camara and See — to rely on a statute to bypass the necessity for a warrant that lacks a single word in its text referring to warrants or even suggesting that the requirement of a warrant has been waived to inspect a private home’s premises.
Nor do they explain why it would be reasonable to rely on such a statute in the face of all the Supreme Court decisions discussed. To allow state officials to entertain “doubts” about the long standing requirement for a warrant when the Court has spoken so clearly and definitively would be to suggest that such officials should almost always be immune from liability for ignoring the warrant requirement. To entertain such “doubts” is to denigrate the Supreme Court’s role in defining constitutional responsibilities out of a misdirected policy favoring inspectors over homeowners.[3]
Here the purpose of the government’s entry had no immediacy, no exigency about it. The inspectors were searching not for criminal contraband but for signs of agricultural disease. Their entry lacked any compulsion of fresh pursuit, loss of criminal evidence caused by delay, or any other recognized urgent circumstance. Unless citrus canker disappears in the time it takes to get a warrant, there is no conceivable reason not to require one. And if it does spontaneously disappear of its own accord within that span of time, there would be little reason to inspect the trees. In short, the governmental agents have offered no reason why they could not simply have gotten a warrant to inspect these trees.
Personally I believe the utter absence of any urgency — or in Fourth Amendment parlance, any exigent circumstances— should eliminate entirely any consideration of whether an officer might have entertained good faith doubts about the effect of Camara and See after the enactment of the statute. I would allow officers to use reasonable doubts for immunity only where there is some exigency in the circumstances, some reason for haste without which something constitutionally significant might be lost.
Procedurally, I think it is also clear that their claim of immunity could not possibly have been decided summarily — that is, without a trial — in favor of the officials in this case. In DeWald v. Wyner, 674 So.2d 836 (Fla. 4th DCA 1996), we explained the burden on qualified immunity thus:
“First, the public official must show that the acts complained of were ‘within the scope of his discretionary authority when the allegedly wrongful acts occurred.’ Second, the plaintiff must show that the public official’s actions ‘violated clearly established constitutional law.’ Rich v. Dollar, 841 F.2d 1558, 1563-64 (11th Cir.1988). Clearly established law must be determined ‘through the eyes of an objective, reasonable government of *660 ficial.’ Nicholson v. Georgia Dept. of Human Resources, 918 F.2d 145, 147 (11th Cir.1990).”
After a public official has shown that he was acting within his discretionary authority when the event occurred, the burden then shifts to the plaintiff to establish that the official’s actions violated clearly established constitutional law.
674 So.2d at 840; see also Naturist Soc. Inc. v. Fillyaw, 958 F.2d 1515, 1523-24 (11th Cir.1992). The party claiming immunity must establish by law a grant of discretion that authorizes the conduct about which complaint has been made. Discretion is not available when a “clearly established constitutional law” precludes it.
Thus, no burden shifts to the party opposing immunity until those claiming immunity show that there was no “clearly established constitutional law” on the subject and that the official had discretion to do what he did. In the face of the law just explicated, I do not understand how a citrus canker inspector can be heard to argue that an “objective, reasonable government official” could conceivably harbor any doubts about the necessity for a warrant. Withal, there is simply no law or fact to support the inspectors’ claim that they had a good faith belief they could enter without a warrant.
Even if I could overlook the lack of a warrant, I cannot ignore the totality of the ensuing conduct of the inspectors and deputy. Their “inspection” was attended by a fierce mutilation. They cut down the gate, they cut down the fence, and then they cut down the trees and ground them into dust. They even went so far as to arrest the owner, who was merely insisting on a warrant, as is his right. The zeal with which they visited destruction on plaintiff suggests a willingness to cut down everything, even the law, to force their way into private residential premises and destroy property located within.
It is a zeal startlingly like the determination of Thomas More’s son-in-law to do anything to get rid of Rich, and Roper’s horror that More would insist on due process of law for the man:
More: What would you do? Cut a great road through the law to get after the devil?
Roper: I’d cut down every law in England to do that!
More: Oh? ... And when the last law was down, and the Devil turned round on you — where would you hide, Roper, the laws all being flat? ... This country’s planted thick with laws from coast to coast — man’s laws, not God’s — and if you cut them down ... d’you really think you could stand upright in the winds that would blow then? ... Yes, I’d give the Devil benefit of law, for my own safety’s sake.
Robert Bolt, A Man For All Seasons, (Vintage 1990). Like Roper, these state inspectors would cut down settled constitutional adjudication to get at their devil. Like More, I think law’s wardens are bound to the law, especially the one settled by the highest authority. Doubts in the minds of state agents should be deemed in good faith only when the law has not been clearly settled by the highest Court.
This court should also strive to make clear that the duty to inspect trees can be properly done without treating property owners like convicted felons. This unwarranted use of governmental powers could be seen by a jury as discrediting the inspectors’ claim of good faith. Surely the arrest of a law-abiding citizen and the ferocious destruction of his property could not be justified by any internal urgency these inspectors fancied. Nothing suggested by anyone would authorize an arrest of the owner and the despoiling of *661 property beyond infected citrus trees. They have failed utterly to show that the immunity claim is legally valid and clear enough to avoid submitting it to a jury.

. § 581.031(15)(a), Fla. Stat. (2005) ("The department has the following powers and duties: ... to inspect plants, plant products, or other things and substances that may be capable of disseminating or carrying plant pests, noxious weeds, or arthropods, and for this purpose shall have power to enter into or upon any place and to open any bundle, package, or other container containing, or thought to contain, such material, and to take possession of such material if determined by the department to pose a threat to the agricultural or public interests of this state.”).

. The trial court’s concern for the ability of the state to find inspectors to do this job without immunity is not only misdirected, but is contradicted by state statutes providing for indemnification of its agents.