# United States Court of Appeals

## For the First Circuit

No. 09-1593

UNITED STATES OF AMERICA,

Appellee,

v.

JAMES WERRA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

Lipez, Howard and Thompson,
Circuit Judges.

Page Kelley, Assistant Federal Public Defender, Federal Defender Office, for appellant.
Richard M. Re, Attorney, Criminal Division, U.S. Department of Justice, with whom Lanny A. Breuer, Assistant Attorney General, Greg D. Andres, Acting Deputy Assistant Attorney General, Carmen Milagros Ortiz, United States Attorney, and Dina Chaitowitz, Assistant United States Attorney, Chief, Appellate Division, were on brief, for appellee.

March 22, 2011

**LIPEZ, Circuit Judge.** This case raises challenging questions about the legality of a stop-and-frisk conducted after law enforcement officers forced their way into a house occupied by a group of unrelated individuals to execute an arrest warrant. Inside the residence, the officers encountered and pat-frisked appellant James Werra – who was not the subject of the warrant – and discovered a gun in his pocket. After Werra was charged with being a felon in possession of a firearm, see 18 U.S.C. § 922(g)(1), he unsuccessfully sought to suppress the gun as the fruit of an unlawful search. The district court concluded that the officers lawfully entered the house and that Werra's detention and frisk were justified as reasonable safety measures. Having failed to obtain suppression of the weapon, Werra entered a conditional guilty plea.

On appeal, Werra reiterates his contentions that the officers lacked the necessary level of suspicion to justify entry of the house without consent and that, like the residents of a traditional single-family home, he had a reasonable expectation of privacy in the foyer and other common areas of the house. Hence, he claims that the officers' forced entry violated his Fourth Amendment rights and the gun must be suppressed. Alternatively, he argues that his suppression motion should have been granted because the officers had no justification for conducting the frisk that produced the weapon.

After close consideration of the law and the facts, we conclude that the officers had insufficient grounds to justify entering the house without consent. We also conclude that Werra demonstrated an expectation of privacy in the foyer of 63 Menlo Street sufficient to challenge the officers' unlawful entry into the dwelling. The stop-and-frisk of Werra thus violated his Fourth Amendment rights, and he is entitled to suppression of the firearm seized from him. Accordingly, we vacate his conviction, reverse the denial of his motion to suppress, and remand for further proceedings.

**I.**

We recite the underlying facts as found by the district court, noting where relevant the defendant's contrary view of the testimony presented at the suppression hearing.

On the morning of November 10, 2006, Police Detective Michael Schaaf and Massachusetts State Trooper Robert Fries were driving around Brockton, Massachusetts, seeking to execute outstanding arrest warrants, including one for Jeanine Daley. They encountered a police informant named Christine, who previously had provided Schaaf with reliable information about the location of a suspect. Christine told the officers that she recently had seen Daley at 63 Menlo Street, a house in a residential neighborhood that Schaaf had been told within the previous year was a "sober house" for recovering drug abusers. Christine told the officers

that Daley, whom Schaaf knew to be a drug abuser, was "staying" there.[1]

The officers proceeded to 63 Menlo Street. Their knock at the front door was answered by Jeffrey Cicerano, a familiar figure to Schaaf because Schaaf had once arrested Cicerano on an outstanding warrant. Cicerano was the named tenant on the lease for 63 Menlo Street and paid most of the $3,000 rent, but other people lived there and contributed to that payment. Appellant Werra paid Cicerano to rent the third floor, which had a bedroom, kitchenette, and a bathroom. Although Werra's girlfriend and her child had at some point lived with him there, they had moved out before November 10. After their departure, Werra at times slept on a couch in the living room "because people would 'party' on the third floor." United States v. Werra, No. 06-10414, 2008 WL 4280035, at *1 (D. Mass. Sept. 11, 2008) (order denying motion to suppress).

Schaaf testified that when he saw Cicerano at 63 Menlo Street, he became concerned that the residence had become a "drug house." Standing outside the front door, Schaaf asked Cicerano if he could talk with him and others in the house. Cicerano asked if

_____

[1] Appellant argues on appeal that the district court went beyond the evidence in finding that Christine told the officers that Daley not only was seen at 63 Menlo Street, but also was "staying" there. Although the record lends support to appellant's contention, resolution of the factual dispute is unnecessary. See infra note 19.

-4-

Schaaf had a warrant. Schaaf said he did not, and then asked if he needed one. Cicerano answered affirmatively and started to walk away from the door. The officers responded by kicking at the bottom of the door, prompting Cicerano to turn back and offer to talk with them outside.

As Cicerano opened the door, however, the officers pushed past him into the entry foyer.[2] Despite Cicerano's demands that the officers leave, they persisted and instructed Cicerano to bring everyone in the house down to the entry area. Cicerano went upstairs, and the officers turned their attention to the living room that was adjacent to the foyer. Through a partially open set of pocket doors, Schaaf and Fries observed Werra sitting on a couch, where he was – in Schaaf's words – "just sort of staring out into space." Schaaf asked Werra if he was all right, but received no response.

Schaaf then heard sounds behind him, and he turned to see three individuals entering the foyer. Two emerged from a first-floor bedroom and the third came from the kitchen, which was located at the back of the house opposite the front door. Seeing movement out of the corner of his eye, Schaaf turned again to see Werra walking out of the living room toward him. Werra's hands

---

[2] The officers testified that Cicerano had invited them into the house, but the district court "largely credit[ed]" Cicerano's contrary account of their entry. Werra, 2008 WL 4280035, at *1 n.1.

-5-

were in his front pants pockets.  Schaaf saw a clip on the right pocket that he recognized as part of a pocket knife, and he reached over and removed the knife from the pocket.  Observing that Werra's left hand was still in his other pocket and "moving a little bit," Schaaf patted Werra down and felt a hard object that he identified as a firearm.  He removed the gun and told Werra he was under arrest.  Werra attempted to flee, but was subdued after a brief struggle.  He was subsequently charged for unlawfully possessing the weapon as a felon.[3]

In ruling on Werra's motion to suppress the gun, the district court issued a thoughtful 27-page decision that focused on two separate aspects of the officers' conduct: their entry into 63 Menlo Street and the stop-and-frisk of Werra.  The court concluded that no Fourth Amendment violation occurred with respect to either action.  It found that the officers had the requisite level of suspicion that Daley was inside 63 Menlo Street to permit forced entry into the house to execute the warrant for her arrest.  The court also held that, given the lawful entry, the officers were allowed to briefly detain Werra while they looked for Daley and arrested her.  The court further concluded that frisking Werra was justified given the circumstances, which included his possession of

---

[3] Daley was in fact found at 63 Menlo Street and arrested.

-6-

the knife and the officers' suspicion that the residence was being used as a "drug house."[4]

Having rejected Werra's challenge to the legality of the frisk that produced the gun, the court denied his motion to suppress the weapon.  Werra's conditional guilty plea and this appeal followed.

**II.**

Werra claims that his Fourth Amendment rights were violated in two distinct ways, and he asserts that either violation is sufficient to require suppression of the firearm seized from him.  First, he contends that the officers unjustifiably forced their way into 63 Menlo Street – his residence – and that any evidence resulting from their unlawful presence in the house must be suppressed.  Werra alternatively claims that, whether or not the officers were lawfully present in the foyer, they lacked justification for conducting the stop-and-frisk that revealed the gun.  As described above, the district court rejected both of these contentions.

In evaluating a district court's denial of a motion to suppress, we review its findings of fact for clear error and apply de novo review "to the application of law to those facts and to

---

[4] Recognizing that the facts underlying the motion to suppress "offer the potential for multiple branches to the decision tree," the district court also assessed Werra's reasonable expectation of privacy in the foyer at 63 Menlo Street.  <u>Werra</u>, 2008 WL 4280035, at *1, **3-5.

conclusions of law." United States v. Rheault, 561 F.3d 55, 58 (1st Cir. 2009). Werra bears the burden of showing a violation of his Fourth Amendment rights. Id. 58-59.

The government argues that the court's rulings are supportable on multiple, independent grounds. First, it asserts that, under Payton v. New York, 445 U.S. 573 (1980), the officers lawfully entered 63 Menlo Street without consent to execute the arrest warrant for Daley,[5] and, once inside, they had the right under Michigan v. Summers, 452 U.S. 692 (1981), to detain Werra to ensure that the warrant could be executed "safely and effectively." See Werra, 2008 WL 4280035, at *7.[6] The government argues that the frisk became necessary and proper because of the officers' objectively reasonable suspicion that Werra was armed and dangerous. See Sibron v. New York, 392 U.S. 40, 64 (1968).

Second, the government argues that Werra may not challenge the officers' entry into, or presence in, the house

---

[5] In Payton, the Supreme Court held that a valid arrest warrant "implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." 445 U.S. at 603.

[6] In Summers, the Court held that a search warrant gives officers "the limited authority to detain the occupants of the premises while a proper search is conducted." 452 U.S. at 705. This case involves an arrest warrant rather than a search warrant, but the district court found the difference of no consequence. It noted that other courts have extended Summers to the arrest context on the ground that "the same law enforcement interests are applicable in both scenarios." Werra, 2008 WL 4280035, at *7 (citing Cherrington v. Skeeter, 344 F.3d 631, 638 (6th Cir. 2003); United States v. Enslin, 327 F.3d 788, 797 (9th Cir. 2003)).

-8-

because he lacked a reasonable expectation of privacy in the foyer – the location in which he was detained and frisked.  See New York v. Class, 475 U.S. 106, 112 (1986) ("[T]he State's intrusion into a particular area . . . cannot result in a Fourth Amendment violation unless the area is one in which there is a 'constitutionally protected reasonable expectation of privacy.'" (quoting Katz v. United States, 389 U.S. 347, 360 (1967) (Harlan, J., concurring))); Rheault, 561 F.3d at 59.  Under this theory, even if there was an unlawful entry that foreclosed reliance on the Summers rationale, the government contends that the officers' interactions with Werra were permissible under Terry v. Ohio, 392 U.S. 1 (1968).[7]

Our analysis begins with Werra's expectation of privacy in the premises at 63 Menlo Street.  After explaining why we conclude that Werra has shown the necessary privacy interest, we address the lawfulness of the officers' entry into the house.  The results of those discussions make it unnecessary for us to evaluate the propriety of the stop-and-frisk.

---

[7] In United States v. Romain, 393 F.3d 63 (1st Cir. 2004), we "decline[d] to adopt a per se rule banning the Terry [stop-and-frisk] doctrine from residential settings" and "similarly decline[d] any rule-like suggestion that Terry's requirement of particularized suspicion is in any way diminished within the home simply because an officer legitimately enters upon its premises." Id. at 76 n.3.

## A. Werra's Reasonable Expectation of Privacy in 63 Menlo Street

Whether a defendant has a reasonable expectation of privacy in a particular place is a two-pronged inquiry. We consider "first, whether the movant has exhibited an actual, subjective, expectation of privacy; and second, whether such subjective expectation is one that society is prepared to recognize as objectively reasonable." Rheault, 561 F.3d at 59. The inquiry is necessarily fact-dependent, "taking into consideration the nature of the searched location, and using our prior decisions for guidance." Id.; see also United States v. Beaudoin, 362 F.3d 60, 70 (1st Cir. 2004) ("Fourth Amendment analysis is renownedly fact specific . . . ."), vacated on other grounds by Champagne v. United States, 543 U.S. 1102 (2005) (mem.). As the district court recognized, Werra's privacy interest in the foyer of 63 Menlo Street is linked to "the proper characterization of the building itself." Werra, 2008 WL 4280035, at *3. As the resident of a dwelling that is "akin to a traditional home," id. at *4, he would possess a reasonable expectation of privacy throughout the interior of the premises. See Payton, 445 U.S. at 590 ("[T]he Fourth Amendment has drawn a firm line at the entrance to the house."); United States v. Weidul, 325 F.3d 50, 52 n.1 (1st Cir. 2003) (noting that a defendant who was "staying or living" with a friend had an expectation of privacy in the friend's home). If the residence were comparable to a multi-unit apartment building,

-10-

however, with "[d]istinct, complete living spaces," Werra, 2008 WL 4280035, at *4, Werra's privacy interest would not extend to common areas such as the foyer. See, e.g., Rheault, 561 F.3d at 59 (noting well settled precedent that "'a tenant lacks a reasonable expectation of privacy in the common areas of an apartment building'" (quoting United States v. Hawkins, 139 F.3d 29, 32 (1st Cir. 1998))); United States v. Brown, 169 F.3d 89, 92 (1st Cir. 1999) (rejecting Fourth Amendment claim based on officer's entry into the lobby of apartment building).

The district court aptly observed that 63 Menlo Street "does not fit squarely into the paradigm for either a traditional family home or a multi-unit apartment building." Werra, 2008 WL 4280035, at *4. Although it is a single-family structure, the residents were not a traditional single family occupying the house together. As other courts have held with respect to rooming houses and fraternities, however, an unconventional household does not necessarily diminish the protection afforded the residents of the house. See, e.g., Reardon v. Wroan, 811 F.2d 1025, 1027 n.2 (7th Cir. 1987) (noting that "fraternity members could best be characterized as 'roommates in the same house,' not simply co-tenants sharing certain common areas"); State v. Titus, 707 So. 2d 706, 708 (Fla. 1998) ("The mere fact that certain rooms traditionally associated with a home are shared by rooming house residents does not render the structure any less a home to those

-11-

residents."); People v. Garriga, 596 N.Y.S.2d 25, 28 (N.Y. App. Div. 1993) ("[E]xisting precedent, although sparse, supports the conclusion that the internal hallway area of this rooming house was part of the defendant's home for Fourth Amendment purposes."). But see, e.g., United States v. Anderson, 533 F.2d 1210, 1214 (D.C. Cir. 1976) (holding that "appellant's constitutionally protected privacy interest began at the door to [his] room . . . rather than at the door to the entire rooming house").[8]

Thus, we agree with the district court that, unlike the typical expectation-of-privacy inquiry, which focuses solely on the particular location in which the evidence the defendant seeks to suppress was found, see, e.g., United States v. Bucci, 582 F.3d 108, 116 (1st Cir. 2009) (front of home, as viewed by video camera); Rheault, 561 F.3d at 59 (third-floor landing of the front stairway); United States v. Meada, 408 F.3d 14, 22 (1st Cir. 2005) (gun case), we must conduct a broader examination of Werra's and the other tenants' living arrangements throughout 63 Menlo Street. If they lived separately – like apartment dwellers – they could not claim the common areas of the house, including the foyer, as their private space vis-a-vis outsiders. However, if they did not live

---

[8] We acknowledge, as the dissent emphasizes, that there are other cases relevant to the expectation-of-privacy issue. None is precisely on point, and we find none more apt than the ones we have cited. As we have explained, the expectation-of-privacy inquiry requires a close, holistic review of the particular record at issue. Our conclusion in this case is a product of such a review.

-12-

in individualized "residences" within the house – and were thus more like the occupants of a single-family home – their right to privacy vis-a-vis outsiders would begin at 63 Menlo Street's front door.  Under the latter scenario, the officers would have violated Werra's reasonable expectation of privacy by forcibly entering the house.   We thus also agree with the district court that the relevant considerations for our inquiry include whether the building contains "recognizably separate living units," the residents' right to exclude others from parts of the building, the number of residents, and the "formal legal relationship" among them.  Werra, 2008 WL 4280035, at *4-5.  Other facts that shed light on how the tenants viewed the dwelling, including the tenants' customary use of various spaces within the premises, also are pertinent in evaluating their subjective expectation of privacy.

We think it of particular note that, unlike an apartment building in which tenants contract individually with the landlord, 63 Menlo Street was rented as a whole by Cicerano.  He described it as "my house" at the suppression hearing and, indeed, Cicerano reported that he paid most of the $3,000 rent – though "everybody pitched in."  The district court listed about a half-dozen individuals who were living in the residence at the time of the police entry.  They were not related – Cicerano, in fact, did not know the last name of a tenant named Paul – but they were also not

thrown together randomly. Cicerano explained that the residents were "basically just friends trying to make it through . . . [n]ot living on the street." The operation of 63 Menlo Street was thus in some respects a collective undertaking, with both the financial arrangements and the informal relationship among the residents suggestive of a single household.

The residents' use of the house points in the same direction. Werra paid rent specifically for the third floor, which contained a bathroom and a kitchenette, and it apparently could have been used as a self-contained unit. At the time of the police entry, however, Werra was not the only person to regularly make use of the third floor, and he did not live solely within it. Werra testified that he had spent "[m]any nights" sleeping on a couch in the living room on the first floor because "when I was up on the third floor, everybody wanted to come up on the third floor."

Other testimony from Werra and Cicerano, although not fully consistent, also indicated that neither Werra nor the other tenants viewed the third floor as an independent living unit at the time the officers entered the house. Werra acknowledged that the third floor was his "own personal space," but said that he had been paying rent for that space only until his girlfriend moved out at the end of October.[9] He testified that, more recently, he had been

---

[9] The specific exchange between the prosecutor and Werra was as follows:

sleeping in the living room.  He explained that he did not have a bed on the third floor – only a pullout couch – and said he and his brother moved furniture into the living room so he could stay there.

Cicerano confirmed that Werra relocated to the living room because the third floor was at times taken over by others, although he described Werra's relocation as intermittent rather than ongoing.  He testified that Werra "once in a while" slept in the living room "because there was a lot of partying basically, and a lot of people went to the third floor, so when he wanted to sleep, sometimes he'd go in there."  Cicerano reported that the third floor had a door and that Werra had the ability to keep people out, but he also indicated that it would have been difficult for Werra to exclude others on the night before the November 10 incident because the first floor was "shut down" in the aftermath of Cicerano's mother's funeral.[10]  Taken as a whole, the evidence regarding Werra's use of the living room showed that he slept there

---

Q. That was your own personal space up there, correct?
A. Uh-huh.
Q. That's what you were paying rent for?
A. When Melissa was there, yes.

[10] When asked if Werra could shut the door to the third floor Cicerano responded: "I imagine, yeah.  But with the downstairs being shut down, if you're asking me could people have partied up there that night?  I can't tell you."  Cicerano was then asked if Werra "had the ability, had he wanted to, to keep people out of the third floor."  He responded: "Yes, but with the first floor being shut down, it would have been kind of – yeah, yeah, he did."

at least intermittently, with Cicerano's consent but at Werra's own discretion.

Although the record contains no direct evidence about Werra's use of the downstairs kitchen and the other bathrooms in the house, Cicerano stated that people would sometimes congregate in the kitchen that adjoined Cicerano's bedroom on the first floor. Given his proximity to the downstairs kitchen when he was sleeping in the living room, it is a fair inference that Werra was at times part of such a group. In addition, when Werra was asked at the suppression hearing to confirm that there was a bathroom on the third floor, he noted that bathrooms also were located on the first and second floors – indicating that he had used them instead of bothering to climb up the stairs.[11]

Not all rooms, however, were open to all tenants. Cicerano had a lock on his bedroom door, and he rarely allowed others to use the adjacent living room because he did not want to be disturbed when he was sleeping. Like Werra, other tenants were

---

[11] The exchange on that issue, in relevant part, was as follows:

Q. But at some point you decided it was too much trouble to go upstairs, and you just started living on the first floor there instead?
A. Yes.
Q. The third floor had a bathroom, correct?
A. Yes, it did.
Q. And it was only three flights up, correct?
A. Yeah, but there was also a bathroom on the first and second floor.

assigned specific rooms; Cicerano testified, for example, that Paul "rented a room on the second floor."

Yet, on balance, Cicerano's and Werra's testimony indicates that the tenants shared the house in much the same way as would a traditional family. Offspring in a single-family home may at times lock bedroom doors or post "do not enter" signs aimed at excluding their siblings and parents from their assigned rooms. And, just as occurs in the traditional family context, the supposed exclusivity of personal space at 63 Menlo Street – at least with respect to Werra's third-floor quarters – was not always respected. Werra's co-tenants were undeterred by the door to the third floor when that space was "needed" for their comfort and enjoyment. Werra behaved similarly, claiming alternative space in the house when the third floor was targeted by others. Though Cicerano limited access to the living room to suit his needs, the record shows that the tenants shared use of the first-floor kitchen and the second- and third-floor bathrooms. These circumstances are a far cry from a typical apartment building setting, where tenants live within discrete units and use common spaces, such as hallways and basements, primarily for storage or access to the outside.

In analyzing whether Werra had demonstrated that 63 Menlo Street was sufficiently like a traditional home to give him an expectation of privacy in relation to outsiders throughout the premises, the district court began by noting that the evidence

"lacked many details concerning the rights of the residents within the building and the relationships among those who lived there." Werra, 2008 WL 4280035, at *5.[12] The court observed that the third floor "appear[ed] to have been an independent living unit from which Werra could exclude others," and it stated that Werra "had no reasonable expectations of privacy in the foyer because others over whom he had no control could pass through it without his permission." Id. The court concluded its analysis by noting that Werra's expectation of privacy in the living room "was limited to the permission for use granted by Cicerano." Id.

The government urges us to adopt the district court's conclusion that "the absence of . . . key facts" means that Werra failed to carry his burden of showing that 63 Menlo Street was equivalent to a traditional home. Id. We agree that the record was less than ideal. That the evidence could have been stronger, however, does not make it inadequate. As we have described, the facts found by the district court indicate that day-to-day living for the tenants at 63 Menlo Street, including Werra, occurred throughout the house. Although the record does not show that the unrelated individuals who resided at 63 Menlo Street behaved like a traditional family, it does show that they were not merely co-

_____

[12] As an example of the imprecision in the record, the court stated that "it is unclear whether the residents shared bathrooms and kitchens, to precisely what extent they were assigned specific parts of the building, and whether they locked doors to keep other people out." Werra, 2008 WL 4280035, at *5.

tenants who passed through the common spaces of the house on the way to and from their independent pursuits. Rather, like the fraternity members described in Reardon, the residents of 63 Menlo Street "could best be characterized as 'roommates in the same house,' not simply co-tenants sharing certain common areas." 811 F.2d at 1027 n.2. Indeed, the residents at 63 Menlo Street were all living with Cicerano, in "his" house, as part of a nontraditional single-"family" household. As Cicerano put it, Werra "stayed at my house, he lived at my house."

The district court's analysis does not address the facts showing that 63 Menlo Street was operated as a single household, including Cicerano's notable testimony that he paid most of the rent. The court's finding that Werra could have lived independently and excluded others from the third floor is correct, but that theoretical arrangement did not reflect the evidence on how Werra and the other residents actually lived. Although the dissent focuses on the discrepancy between Werra's and Cicerano's testimony about how frequently Werra slept in the living room, the analysis is the same whether Werra did so intermittently or "[m]any nights"; the fact remains that it was an ordinary occurrence for others to use the third floor and for Werra to relocate to the living room. Moreover, Werra testified that his brother helped him move furniture into the living room, conduct that shows a belief

that he had a personal claim to the space – albeit a claim that was subject to the quiet use that was demanded by Cicerano.[13]

The government cites no case in which a resident of a single-family structure was found to lack a reasonable expectation of privacy, relative to outsiders, in the common areas of his or her house. Instead, it points to inapposite cases involving duplexes or larger buildings in which tenants lived in separate, fully self-contained units. Similarly, the district court mistakenly adopted the frame of reference for multi-unit buildings in observing that Werra lacked a privacy interest in the foyer because others living in the house could pass through the entryway without his permission. The inability to exclude cohabitants from shared spaces within a traditional home does not on its own eliminate a resident's privacy interest in keeping outsiders from

---

[13] Even if, as our dissenting colleague asserts, the district court impliedly credited Cicerano's notion of how often Werra slept in the living room over Werra's statement that he spent many nights there, there is no basis for concluding that the court generally disbelieved Werra and hence we should disregard all of his testimony. The court's analysis of Werra's expectation of privacy in the foyer was brief and, as noted, it emphasized the details missing from the record.

We thus disagree with the dissent's suggestion that we have not been appropriately deferential to the district court's fact-finding. Our dispute is with the court's legal conclusion that the facts of record did not show that Werra possessed a reasonable expectation of privacy in the foyer. That ultimate issue, involving application of law to facts, is subject to de novo review. See Rheault, 561 F.3d at 58. Moreover, our obligation to draw all reasonable inferences in the government's favor, see United States v. Dubose, 579 F.3d 117, 120 (1st Cir. 2009), does not require us to ignore facts favorable to the defendant.

barging through the front door.  Individuals routinely bring friends into their homes without the consent of every family member who resides there, and such unilateral decisions do not convert the hallway or entrance of a private home into a public space.  There is no evidence that people who did not live at 63 Menlo Street routinely entered without the consent of a resident, which might have undermined the presumption of privacy that normally attends the interior of a residence.[14]

In sum, based on the facts of record, we conclude that Werra has met his burden to show that he possessed a subjective expectation of privacy in the foyer of 63 Menlo Street – or, more specifically, that he believed the entire house, and not just the third floor, served as his home and, hence, that he could prevent the entry of anyone whom he and his housemates wished to keep out. We further conclude that, on this record, Werra's expectation of privacy was reasonable.  A resident of a single-family structure who shares living arrangements as did the tenants of 63 Menlo

_____

[14] Of course, this would be a very different case if Cicerano had given the officers permission to enter.  Even with a reasonable expectation of privacy in the entire premises, Werra could not challenge the officers' presence in the foyer if Cicerano had let them in.  See United States v. Matlock, 415 U.S. 164, 171 n.7 (1974) ("[C]o-inhabitants . . . have assumed the risk that one of their number might permit the common area to be searched."); cf. Georgia v. Randolph, 547 U.S. 103, 106 (2006) (holding that "a physically present co-occupant's stated refusal to permit entry prevails").  The government does not challenge on appeal the district court's finding that the officers entered the house without consent.

Street could reasonably expect that his right to privacy begins at the front door. See Titus, 707 So. 2d at 708 (holding that, "just like private homeowners, rooming house residents have an actual expectation of privacy in the common areas of the rooming house" and that "given the sanctity of the home, society is prepared to recognize that expectation as reasonable").[15]

Because Werra had a reasonable expectation of privacy in the foyer, he is entitled to challenge the officers' forcible, warrantless entry into the house. The government claims that the officers lawfully entered to execute the arrest warrant for Daley. We now turn to that contention.

## B. The Officers' Entry into the House

In Payton v. New York, the Supreme Court held that police officers attempting to execute an arrest warrant have "limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." 445 U.S. at 603. Payton's two-prong inquiry thus requires us to ask whether Schaaf

---

[15] The subjective beliefs of Werra and the other tenants are a particularly significant component of the analysis here because they shed light on the nature of the living arrangements within the single-family house. The tenants' belief that they may occupy spaces throughout the house, and their behavior reflecting that belief, evidence a subjective expectation of privacy vis-a-vis outsiders akin to that possessed by the members of a traditional single-family household. That traditional expectation of privacy begins at the front door of the home, and there is thus no need to examine Werra's use of the foyer in particular. The objective reasonableness of Werra's subjective expectation of privacy depends, as we have described, on a holistic assessment of the facts of record.

-22-

and Fries had a sufficient basis to believe that Daley (1) lived at 63 Menlo Street and (2) was at home at the time of their entry. The district court described the issue as "close" and the evidence supporting the government's position as "thin." Werra, 2008 WL 4280035, at *9. The government itself stated at oral argument before the district court that the arrest warrant did not give the officers the authority to enter the house.[16] Nonetheless, the court concluded that "a reasonable officer in the same position could have formed an objectively 'reasonable belief' that Jeanine Daley lived at the premises and was present at the time of entry." Id. at *10.

As a threshold matter, Werra argues that the court's use of the "reasonable belief" standard was incorrect, and that the officers instead needed to demonstrate that they had probable cause to believe that Daley lived in the Menlo Street house and was home on the morning of November 10. Although most circuits to have considered the issue have adopted the "reasonable belief" standard, and treat it as less stringent than probable cause, see, e.g., El Bey v. Roop, 530 F.3d 407, 416-17 (6th Cir. 2008); United States v.

---

[16] In response to a question from the court, the prosecutor responded:

> Your Honor, I don't think had it infringed on any expectation of privacy of the defendant, I don't think the officers had enough information about the presence of Jeanine Daley in there to rely on the arrest warrant. I think it was an insufficient basis for th[eir] being in the building and seeking to find her there.

Thomas, 429 F.3d 282, 286 (D.C. Cir. 2005); Valdez v. McPheters, 172 F.3d 1220, 1224-25, 1227 n.5 (10th Cir. 1999); United States v. Lovelock, 170 F.3d 339, 343 (2d Cir. 1999), the Ninth Circuit requires probable cause, see United States v. Gorman, 314 F.3d 1105, 1115 (9th Cir. 2002). We have not explicitly made a choice, but have implicitly accepted the majority view. See, e.g., United States v. Graham, 553 F.3d 6, 12-14 (1st Cir. 2009). In this case, the government cannot meet even the less stringent reasonable belief standard.

The relevant information possessed by the officers in this case, as found by the district court, was the following: (1) an informant (Christine) told the officers that she had recently seen Daley at 63 Menlo Street and that Daley was "staying" there, Werra, 2008 WL 4280035, at *9; (2) Christine had previously provided Schaaf with accurate information about the location of a suspect; (3) Schaaf was aware that Daley had been a drug abuser; (4) on Schaaf's previous visit to 63 Menlo Street, within the previous year, "he had observed it to be a sober house with tenants living on the premises," id.; and (5) the officers arrived at the house "relatively early in the morning, at approximately 10:00 a.m," id. at *10.

We doubt that this information was sufficient to support even the first prong of the Payton inquiry – that Schaaf and Fries could reasonably believe that Daley was living at 63 Menlo Street

-24-

when they forced their way into the house. Although eyewitness evidence from a reliable informant that an individual was staying at a certain location might in some circumstances suffice to support a reasonable suspicion that the individual lives there, the context here does not permit such reliance on Christine's statement. In his affidavit, Schaaf reported that Christine had told the officers that at some point "recently" – a term that could refer to days or weeks earlier[17] – she had seen Daley at the Menlo Street house. Cf. United States v. Pruitt, 458 F.3d 477, 478-79 (6th Cir. 2006) (finding reasonable belief that the suspect was present where, inter alia, an anonymous caller had reported seeing him "within the past few hours").

A different home address appeared on the arrest warrant for Daley and, even accepting that she had stayed at the Menlo Street house "recently," the officers neither conducted surveillance nor took any other steps to verify that her stay had not been temporary. If the house were a sober house, as Schaaf had been told, Daley might have passed through only briefly in an attempt to deal with her drug abuse problem. An extended stay was no more inevitable if the house were instead a haven for drug users, which Schaaf said he suspected when Cicerano – another known drug user – came to the door.

---

[17] Given that it was early in the morning, we see no basis for an inference that "recently" meant earlier that day.

-25-

The skimpy evidence of Daley's residency at 63 Menlo Street contrasts sharply with the information available to officers in other cases raising a Payton issue. For example, in Graham, 553 F.3d at 13, a police report about a domestic incident identified the defendant as the offender and gave his address as the building where he was subsequently arrested. In addition, the officers had tried to execute the warrant at the defendant's previous address, but did not find him. Id. at 10. Similarly, in United States v. Clayton, 210 F.3d 841 (8th Cir. 2000), a police record indicated the defendant lived at the address where the arrest was made. Id. at 842; see also, e.g., United States v. Jones, 523 F.3d 31, 37 (1st Cir. 2008) (finding entry into hotel room lawful where hotel manager told officers that suspect had rented a particular room for three weeks, and a man detained in the parking lot told officers that suspect was then inside the suite); United States v. Pelletier, 469 F.3d 194, 197, 200-01 (1st Cir. 2006) (finding entry into a motel room lawful where officers who went to defendant's home were told he was not there; defendant's girlfriend's sister said he was at a certain room at a motel; the room was registered in the sister's name; and a motel maintenance worker identified the defendant as the sole occupant of the room); Valez, 172 F.3d at 1226-27 (finding entry justified where, among other factors, suspect had told an officer that he lived at the location and other law enforcement officers informed the entering authorities that he

lived there); <u>United States</u> v. <u>Risse</u>, 83 F.3d 212, 214-16 (8th Cir. 1996) (finding entry lawful where, among other factors, the defendant had told the police that she was "staying" at the location and the officers could contact her there).

Even if the informant's tip, together with Schaaf's general impression of 63 Menlo Street, were enough to support a reasonable belief that Daley was living in the house, there was not a shred of evidence to satisfy the second <u>Payton</u> prong – that the officers reasonably believed she was in the house at the time they entered. As noted above, the officers made no attempt to confirm the currentness of Christine's information by, for example, conducting surveillance or placing a telephone call to the house. Cf. <u>El Bey</u>, 530 F.3d at 417 (noting that "a review of the relevant caselaw indicates that law enforcement officers often rely on independent investigation and observations of the premises to determine whether a suspect is actually inside before entering"). Although "actual viewing of the suspect on the premises is not required," <u>Valdez</u>, 172 F.3d at 1226, the officers must point to at least some evidence suggesting that the individual named in the arrest warrant is present. <u>See</u> <u>id.</u> (citing numerous cases and various types of circumstantial evidence, including presence of a car associated with the suspect and knowledge of employment circumstances that would make it likely the suspect would be at home and asleep); <u>see</u> <u>also</u> <u>Pruitt</u>, 458 F.3d at 483 (same, noting

-27-

that reasonable belief may be generated by "consideration of common sense factors and the totality of the circumstances").

The government asserts that officers should not be expected to "conduct resource-draining stake-outs in order to arrest suspects at their known residences," and it correctly points out that courts regularly uphold entries where the time of day suggested the suspect's presence at home. See, e.g., Thomas, 429 F.3d at 286 (noting that "the early morning hour [between 6:00 and 6:30 a.m.] was reason enough" for the officers to believe the defendant would be at home); United States v. Bervaldi, 226 F.3d 1256, 1267 (11th Cir. 2000) (concluding that it was "reasonable to believe, in the absence of contrary evidence, that [suspect] would be at his residence at 6:00 in the morning"); United States v. Terry, 702 F.2d 299, 319 (2d Cir. 1983) (finding reasonable belief that suspect would be at home at 8:45 a.m. on Sunday morning); United States v. Bridgewater, 333 F. App'x 470, 472 (11th Cir. 2009) (holding that "[e]arly morning police entry [7:00 a.m.] weighs in favor of finding that the officers reasonably believed [suspect] was inside the house").  The government argues that, as in those cases, Schaaf and Fries reasonably could rely on the time of day and assume that Daley was home at 10:00 a.m. on the Friday morning they entered 63 Menlo Street.

The time-of-day precedent, however, does not support the conclusion the government wishes us to draw.  In the cases cited by

the government and in others where timing was a factor, there was no serious question that the location of the arrest was where the defendant lived,[18] and information beyond timing frequently contributed to the officers' reasonable belief that the suspect was present. See, e.g., Valdez, 172 F.3d at 1227 (holding that midday entry was constitutional where suspect "was unemployed, liked to stay out late drinking, [and] sometimes abused drugs such as heroin and cocaine"); United States v. Munoz, 150 F.3d 401, 407, 411 (5th Cir. 1998) (listing officers' 5:00 a.m. arrival as one factor supporting reasonable belief suspect was at home); United States v. Lauter, 57 F.3d 212, 213, 215 (2d Cir. 1995) (finding reasonable belief that suspect was in the apartment at 8:30 a.m. Monday because he "was unemployed and typically slept late"); United States v. Hayes, 209 F. App'x 548, 551 (7th Cir. 2006) (rejecting challenge to reasonable belief that suspect would be home as frivolous where police "entered at 10:00 a.m. on a weekday" and the suspect "was an unemployed drug addict with no car").

---

[18] In Thomas, a federal officer testified, without details, that the defendant's address was learned "after an 'investigation was done.'" 429 F.3d at 286. In holding that the testimony was sufficient to establish a reasonable belief that the defendant lived at that address, the court noted that the defendant was a parolee who was required to keep his current address on file with his parole supervision officer. Id. The likely source of the information was therefore apparent and reliable. See id. (noting that the defendant did not attempt to elicit details of the investigation).

The fact that an individual is known to live at a particular location is one sound reason to expect him or her to be there.  See 2 Wayne R. LaFave, Search and Seizure § 6.1(a) (4th ed. 2004) (noting that "the police need not possess 'special knowledge' that the defendant is at home . . . for in the absence of facts tending to show that the defendant is not at home it is reasonable to infer that he would be there").  Here, however, the officers' knowledge of Daley's residence consisted only of Christine's imprecise, uncorroborated statement that Daley had "recently" been staying at 63 Menlo Street.

Moreover, there is no evidence to suggest that Daley ordinarily would be home at 10:00 a.m. on a weekday, wherever she lived.  So far as the record shows, the officers had no information about whether she was employed or about her nighttime and daytime routines.  Entering a home at 10:00 a.m. is significantly different from entering at 5:00 or 6:00 a.m., when even working individuals can reasonably be presumed to be at home.  The fact that Daley was a drug abuser possibly living in a "party" house or a recovering drug user living in a sober house does not reveal her employment status or inclination to sleep late.  Nor does the crime for which the warrant was issued – a non-violent probation violation stemming from a conviction for larceny of a motor vehicle – suggest that she was likely to be unemployed and at home.  In sum, none of the factors typically considered to be evidence of a suspect's presence

-30-

were part of the record here.[19]  In these circumstances, the officers could not have formed a reasonable belief that Daley was at 63 Menlo Street when they forcibly entered the house.[20]

---

[19] The dissent mistakenly construes our analysis in suggesting that we are improperly demanding more than a "reasonable belief" that Daley resided at 63 Menlo Street.  We have merely pointed out that, in cases where time of day has provided a basis for believing a suspect would be at home, the location of the suspect's residence was well established – making it more likely that he or she would be there.  By contrast, where the officers knew only that Daley had "stayed" at a residence not known to be her home at some undefined "recent" time, arriving at mid-morning on a work day cannot on its own support a reasonable belief that she would be there.  Moreover, recognizing that a relationship may exist between the officers' knowledge on the two Payton prongs does not conflate the two inquiries.

The circumstances in United States v. Gay, 240 F.3d 1222 (10th Cir. 2001), a case highlighted by the dissent, were markedly different from those here.  A confidential informant whom officers encountered at the home of the suspect's uncle stated that the suspect did not live there.  Id. at 1225.  Unlike the imprecise information about the suspect's whereabouts offered by Christine, the informant in Gay "knew, from personal experience and numerous visits," that the suspect lived at a residence two miles away.  Id.  The informant accompanied officers to that location and told them the suspect was "presently in his home."  Id.  Similarly, contrary to the dissent's assertion, the facts of Hayes do not closely resemble the circumstances here.  Among other differences, the officers in Hayes knew where the suspect lived, and his probation officer had told them that the suspect would likely be at the apartment.  See 209 F. App'x at 551.

[20] We note that the record raises some questions about whether Christine in fact reported that Daley was "staying at" 63 Menlo Street.  Although Schaaf testified on direct examination at the suppression hearing that the officers had received information that Daley "was staying at 63 Menlo Street," his affidavit reported that Christine "indicated she had seen [Daley] recently at 63 Menlo Street" (emphasis added).  Schaaf backtracked a bit in his testimony on cross-examination, agreeing that the information in the affidavit – i.e., that Christine indicated that she had seen Daley at the house – was "about the sum" of what Christine had said.  Fries, meanwhile, testified on direct examination that Christine told the officers that she had "seen [Daley] earlier up

The government thus got it right the first time, when it told the court that the information available to the officers was insufficient to support a reasonable belief that Daley would be inside 63 Menlo Street at the time they entered the house.  Hence, the officers' entry into the foyer was unlawful and, because Werra possessed a reasonable expectation of privacy there, the illegal entry violated his Fourth Amendment rights.  The firearm seized in the course of the stop-and-frisk was a fruit of that violation and, accordingly, it should have been suppressed.  See Wong Sun v. United States, 371 U.S. 471, 484-85 (1963); United States v. Sanchez, 612 F.3d 1, 4 (1st Cir. 2010).

We hasten to add that we are not suggesting that officers who unlawfully enter a home must subject themselves to the risk of being harmed by a resident whom they believe is armed and dangerous.  They are certainly entitled to take reasonable actions to defend themselves.[21]  But the reasonableness of the officers' interaction with such an individual for that protective purpose does not determine the Fourth Amendment suppression issue generated by the unlawful entry.  In this case, because Werra had a

at Menlo Street," and on cross-examination agreed that Christine told the officers that she had "recently seen" Daley there.  Given the absence of other evidence, it makes no difference to our analysis whether Christine reported that Daley was "staying" there or had only been seen there.

[21] Although we agree in this respect with our dissenting colleague, we offer no view on his analysis of the detention issue under Terry.

-32-

reasonable expectation of privacy in the foyer and the officers entered the house unlawfully, the officers' encounter with Werra and the discovery of the gun were both results of the officers' unconstitutional conduct.  Werra was thus entitled to suppression of the gun.

We therefore reverse the district court's denial of Werra's motion to suppress, vacate Werra's conviction, and remand the case for further proceedings consistent with this opinion.

So ordered.

———————————— – Dissenting Opinion Follows –

**HOWARD**, <u>Circuit Judge</u> **(dissenting)**. I respectfully disagree that Werra had a reasonable expectation of privacy throughout 63 Menlo Street such that he could challenge the officers' entry. In any event, I conclude that the officers' entry into the building was lawful. And I am persuaded that Det. Schaaf lawfully detained and patted Werra during the execution of a valid arrest warrant. These views compel me to dissent from the majority's conclusion that the firearm found in Werra's front pants pocket should be suppressed.

## I.

Werra must establish that "his own Fourth Amendment rights were violated by the challenged search or seizure." <u>Rakas</u> v. <u>Illinois</u>, 439 U.S. 128, 131 n.1 (1978). His threshold burden is to prove that "he had a legitimate expectation of privacy in 'the place searched or the thing seized.'" <u>United States</u> v. <u>Rheault</u>, 561 F.3d 55, 59 (1st Cir. 2009) (quoting <u>United States</u> v. <u>Thornley</u>, 707 F.2d 622, 624 (1st Cir. 1983)). To do so Werra must show not merely that he had an "actual, subjective, expectation of privacy," but that his "subjective expectation is one that society is prepared to recognize as objectively reasonable." <u>Id.</u> (citing <u>Smith</u> v. <u>Maryland</u>, 442 U.S. 735, 740 (1979)). Like the district court, I conclude that Werra has failed to satisfy this burden.

Following a two-day evidentiary hearing, the district court found that Werra did not have an objectively reasonable

-34-

expectation of privacy. The district court's findings, set forth in a thoughtful rescript, included the following. Werra paid rent to occupy an "independent living unit" on the third floor, replete with "a bedroom, a kitchenette and a bathroom." United States v. Werra, No. 06-10414, 2008 WL 4280035, at *1, *5 (D. Mass. Sept. 11, 2008). His third-floor unit was his "personal space" and he "had the ability to keep people out of that part of the building," although tenants would sometimes "party" on the third-floor, prompting Werra to sleep on a couch downstairs "once in a while" with Cicerano's permission. Id. at *1. Unlike his third-floor unit, Werra "had no expectation of privacy in the foyer because others over whom he had no control could pass through it without his permission." Id. at *5. And, critically, Werra failed to demonstrate "that 63 Menlo Street was akin to a traditional home" with evidence "concerning the rights of the residents within the building and the relationships among those who lived there." Id.

None of our cases is directly on point, but Rheault provides an adequate starting point for the analysis. There, we concluded that a tenant renting the second of three units in a three-story building (a so-called triple-decker) did not have an objectively reasonable privacy expectation in the third-floor landing. 561 F.3d at 57, 61. We reasoned that the proximity of the third-floor landing to the defendant's second-floor unit cut against the reasonableness of his privacy interest, as did his

-35-

inability to exclude others from that area. Id. at 61 ("a potentially revolving cast of third-floor tenants and their guests had relatively unfettered access to the very area in which Rheault claims an expectation of privacy"); see also Rawlings v. Kentucky, 448 U.S. 98, 105 (1980) (no privacy interest in purse because petitioner did not "have any right to exclude other persons from [it]").

Other courts of appeals have reached the same conclusion in circumstances remarkably similar to this case. For example, in United States v. Befell, the defendant was arrested in the hallway of a "multi-tenant rooming facility" in which he "occupied an upstairs room in exchange for rent." 311 F. App'x 461, 463 (2d Cir. 2009) (internal brackets omitted). After the district court denied his motion to suppress, the defendant appealed on the basis of his purported privacy expectation in the rooming house at large. The Second Circuit, however, rejected his argument. It began with the bedrock principle that "the defendant 'bears the burden of proving . . . that he had a legitimate expectation of privacy in [the area intruded upon].'" Id. at 463 (quoting Rawlings, 448 U.S. at 104). Reviewing the "scant" evidence of communal living adduced below, the court held that the defendant fell short of that burden:

> [The defendant] provided scant evidence to support the
> inference that he had a reasonable expectation of privacy
> in the common hallway at [the rooming house]. He did not
> endeavor to show circumstances regarding his relationship
> with the other renters, their particular use of the
> common areas, or any other factor that might conceivably

-36-

> form the basis of a conclusion that the officers'
> presence in the common hallway of [the rooming house]
> implicated [the defendant's] reasonable privacy
> expectations.

Id. (emphasis supplied).[22]

The majority ignores Befell in favor of three cases that are not especially useful. The linchpin in that trio was that residents had to traverse common areas in order to get to shared kitchens and bathrooms, making their arrangements more like single-family homes. State v. Titus, 707 So. 2d 706, 708 (Fla. 1998); People v. Garriga, 596 N.Y.S.2d 25, 28 (N.Y. App. Div. 1993); see Reardon v. Wroan, 811 F.2d 1025, 1027 n.2 (7th Cir. 1987).[23] Indeed, in Titus, the Florida Supreme Court expressly limited its holding to common areas that linked such "inseparable features of their 'home'":

> Interior hallways in rooming houses are protected only by
> virtue of linking such traditional rooms within the house
> -- they provide rooming house residents with the only
> means of access to these rooms, and are an inseparable
> feature of their "home." In other words, it is not any

---

[22]Accord United States v. Mendoza, 281 F.3d 712, 715 (8th Cir. 2002) (rejecting argument that defendant had privacy interest in vestibule of two-story duplex based on his bald assertion that he, "his children, girlfriend, and her children . . . treated the upper unit, the lower unit, and the vestibule as communal space") (internal quotation marks omitted).

[23]Reardon is distinguishable for the additional reason that the Seventh Circuit relied on the unique character of a fraternity, which it said was "intended to be something of an exclusive living arrangement with the goal of maximizing the privacy of its affairs." 811 F.2d at 1027 n.2. No such showing has been made in this case.

inherent nature of a hallway that controls, but rather what the hallway links (i.e., individual self-contained living units versus shared traditional living areas).

Titus, 707 So. 2d at 711; see also Garriga, 596 N.Y.S.2d at 29 ("There is too, in our view, importance on another level in finding the common internal hallway area of a rooming house a private, as opposed to a public, place . . . . Clearly, it is economic necessity that requires those who live in such humble circumstances to dwell there.  That they cannot afford to have their own kitchens and bathrooms, and hallway access thereto, does not render such areas 'public.'") (internal citations omitted).[24]

Here, Werra did not need to pass through common areas in order to access his kitchen or bathroom.  Rather, the record is quite clear that Werra could -- and regularly did -- live autonomously in his own self-contained unit on the third floor. True, we do not know whether other units were similarly self-contained, but that is precisely the point:  it was Werra's burden

_____

[24]I reserve judgment on whether the majority's cases -- all nonbinding, of course -- were decided correctly.  My point here is only that they are inapposite under the facts found by the district court.  Other courts that have considered the question head-on have held that a rooming house resident's privacy interests begin at the entrance to his or her room -- not the entrance to the entire rooming house. E.g. United States v. Anderson, 533 F.2d 1210, 1214 (D.C. Cir. 1976) ("appellant's constitutionally protected privacy interest began at the door to room eight rather than at the door to the entire rooming house"); accord State v. Checkrowed, 822 S.W.2d 552, 554-55 (Mo. App. Ct. 1992) (no privacy interest in hallway of boarding house where residents shared a kitchen and bathroom); United States v. Williams, No. 05-191, 2007 WL 4302971, at *4 (D. Conn. Dec. 6, 2007) (no privacy interest in third-floor closet of rooming house where residents shared bathrooms).

to show, as the majority acknowledges, that tenants were "'roommates in the same house,' not simply co-tenants sharing certain common areas." Ante at 18 (quoting Reardon, 811 F.2d at 1027 n.2). By failing to put forward evidence concerning the living arrangements of other tenants and their particular use of common areas, Werra fell short of that burden. See, e.g., Befell, 311 F. App'x at 463.

The majority cobbles together several pieces of testimony that, I am told, compel a contrary conclusion. In my opinion, none withstands close scrutiny.

First, drawing from Cicerano's testimony, the majority reports that "unlike an apartment building in which tenants contract individually with the landlord, 63 Menlo Street was rented as a whole by Cicerano." Ante at 13. In particular, the majority points to Cicerano's description of 63 Menlo Street as "my house," id. at 13; see also id. at 18-19 ("the residents at 63 Menlo Street were all living with Cicerano, in 'his' house, as part of a nontraditional single-'family' household. As Cicerano put it, Werra 'stayed at my house, he lived at my house.'"), and his testimony that, although all his tenants "pitched in," Cicerano ultimately paid "most" of the rent. Id. at 4; see also id. at 19 (faulting the district court for not addressing "the facts showing that 63 Menlo Street was operated as a single household, including Cicerano's notable testimony that he paid most of the rent").

-39-

Thus, according to my colleagues, "the tenants shared the house in much the same way as would a traditional family."  Id. at 16.

But however informal it may have been, the relationship between Cicerano and his tenants was less familial than the majority's characterization suggests.  Tenants were assigned rooms or apartments; at least some of those could be locked to the exclusion of other tenants; and at least one -- Werra's third-floor apartment -- was also fully self-contained.  They paid rent to Cicerano in order to occupy those spaces.  And, as far as the record shows, they were not related to Cicerano or necessarily on close terms with him.  Cicerano testified, for instance, that he did not know the last name of one of his tenants.  On this record, the majority's analogy to a "traditional family" home is, in my opinion, rather inapt.

Moreover, multi-unit homes were common in the area. Detective Schaaf testified, for example, that there were "many multifamily homes" in the vicinity of 63 Menlo Street.  Based on Det. Schaaf's testimony, the record description of Werra's self-contained unit, and Werra's failure to adduce evidence concerning the living arraignments of his co-tenants, I think it is unreasonable to infer -- as the majority does -- that 63 Menlo Street was the anomaly here.  See, e.g., United States v. Cook, 277 F.3d 82, 84 (1st Cir. 2002) (when reviewing suppression denials, we must "construe the record in the light most favorable to the

-40-

district court's ruling, drawing all reasonable inferences in the government's favor").

And although Cicerano testified that he paid "most" of the monthly rent, he never explained what he meant.[25]  He could have meant several things:  he could have meant, as the majority appears to believe, that he paid nearly all of the rent; or, equally plausible in my view, that he paid more than any other tenant but still less than half of the rent.  See Webster's Third New Int'l Dictionary 1474 (1993) (defining "most" as "the greatest amount or quantity" in addition to "the majority" of something).  The latter, if true, would cut against the majority's characterization of 63 Menlo Street.  The salient point, however, is that Cicerano's vague testimony is susceptible to different interpretations, and I see no basis for rewarding Werra -- who lost his motion to suppress below -- with the most favorable one.  In fact, as noted, courts of appeals are supposed to do the very opposite.  See, e.g., Cook, 277 F.3d at 84.

Second, the majority refers to Werra's testimony that "he had spent '[m]any nights' sleeping on a couch in the living room on the first floor because 'when I was up on the third floor, everybody wanted to come up on the third floor.'"  Id. at 14; see

_____

[25]On cross-examination, the government sought to have Cicerano quantify the amount of rent his tenants paid.  Cicerano responded, without elaboration, "[j]ust what [they] could."

also id. at 17 ("Werra's co-tenants were undeterred by the door to the third floor when that space was 'needed' for their comfort and enjoyment. Werra behaved similarly, claiming alternative space in the house when the third floor was targeted by others.").

The district court, however, disregarded Werra's testimony in that respect. Favoring Cicerano's version instead, the district court found both that Werra could exclude others from his apartment and only "sometimes" slept downstairs:

> The third floor was Werra's personal space and he had the ability to keep people out of that part of the building. In addition to renting the third floor, Werra sometimes -- "not a lot but once in a while," according to Cicerano -- slept on the couch in the living room on the first floor, with Cicerano's permission, because people would "party" on the third floor.

Werra, 2008 WL 4280035, at *1 (emphasis supplied). Those findings -- amply supported in the record -- were based on a credibility determination, albeit an implicit one, that we review only for clear error. United States v. Verdugo, 617 F.3d 565, 576 (1st Cir. 2010); see also United States v. Espinoza, 490 F.3d 41, 46 (1st Cir. 2007) ("credibility calls -- with only rare exceptions -- are the district court's prerogative"); United States v. Zapata, 18 F.3d 971, 975 (1st Cir. 1994) (appellate courts must "exhibit great respect for the presider's opportunity to hear the testimony, observe the witnesses' demeanor, and evaluate the facts at first

hand"). The record suggests no reason whatsoever to question that determination.

The majority responds by asserting that, no matter whether the district court credited Cicerano or Werra, "the fact remains that it was an <u>ordinary</u> occurrence for others to use the third floor and for Werra to relocate to the living room." <u>Ante</u> at 19 (emphasis supplied). According to the majority, that fact, along with Werra's testimony that he moved some of his furniture into the living room, "shows a belief that he had a personal claim to the space." <u>Id.</u> These assertions are perplexing. The first disregards the district court's fact-finding, which I have block quoted (and emphasized) above, on that precise question.[26] <u>Werra</u>, 2008 WL 4280035, at *1. The second is beside the point. As discussed, Werra's subjective "belief" is meaningless unless "society is prepared to recognize [it] as objectively reasonable." <u>Rheault</u>, 561 F.3d at 59. I doubt that moving one's couch into another tenant's living room, and then "sometimes" sleeping on it after obtaining permission (which was not always granted here), warrants societal recognition of a privacy interest. And even if

_____

[26]The majority's fallback position is that, even if the district court impliedly credited Cicerano's account of how often Werra slept downstairs, "there is no basis for concluding that the court generally disbelieved Werra and hence we should disregard all of his testimony." <u>Ante</u> at 19 n.11. I ask only that we defer to the district court's credibility determination, as our precedent requires, on this <u>specific</u> issue. In my opinion, the majority has not done so.

one were to engage in that doubtful assumption, "the space" in question is the foyer, where Werra was stopped, not the living room. I discern no facts in the record that remotely suggest an objectively reasonable privacy interest in the foyer (or, for that matter, throughout the building at large).

Third, the majority points to Cicerano's testimony "that people would sometimes congregate in the kitchen," ante at 15,[27] and to Werra's testimony that, in addition to the bathroom in his third-floor unit, "bathrooms were located on the first and second floors." Id. at 16. From these snippets, the majority declares that "the record shows that the tenants shared use of the first-floor kitchen and the second- and third-floor bathrooms." Id. at 17.

In my view, that inference is at best highly questionable. As noted, Werra's central theory is that the tenants of 63 Menlo Street lived communally. I think that it is telling, however, that Werra failed to adduce any direct evidence that he used a kitchen or bathroom other than his own. He or Cicerano -- or any of the several co-tenants, none of whom Werra called -- easily could have said so at the suppression hearing. The more

_____

[27]The majority paraphrases Cicerano's testimony on cross-examination where the government asked whether "people would sometimes congregate in the [first-floor] kitchen." Cicerano responded "Yeah," with no elaboration other than to say that such gatherings had not occurred recently in the wake of his mother's death.

reasonable inference to draw from the testimony as a whole is that Werra and others generally used the facilities that were assigned to them. See, e.g., Cook, 277 F.3d at 84. And moreover, evidence that tenants may have gathered sporadically in one of multiple kitchens provides no reasonable basis to believe that life at 63 Menlo Street was anything like the communal arrangements described in the cases relied on by the majority, in which all residents shared a single kitchen out of necessity. Titus, 707 So. 2d at 708; Garriga, 596 N.Y.S.2d at 28; see Reardon, 811 F.2d at 1027 n.2.

In sum, I would hold that Werra failed to establish an objectively reasonable expectation of privacy outside of his third-floor apartment. Without that showing, he cannot contest the officers' entry into 63 Menlo Street. New York v. Class, 475 U.S. 106, 112 (1986); Rheault, 561 F.3d at 59.

## II.

The above conclusion requires me to address the search and seizure of Werra's person. See Terry v. Ohio, 392 U.S. 1, 16 (1968). I conclude that Det. Schaaf lawfully detained and patted Werra, on an objectively reasonable basis of officer safety, while he and Trooper Fries executed a valid arrest warrant.

Ultimate constitutional questions like these call for de novo review, Espinoza, 490 F.3d at 46 ("Legal conclusions,

-45-

including ultimate constitutional determinations (such as the sufficiency of the facts found to support a conclusion that, for example, reasonable suspicion exists or a seizure occurred), engender de novo review."), and that review is "not confined to a consideration of the grounds relied on by the district court." United States v. Soule, 908 F.2d 1032, 1036 n.7 (1st Cir. 1990); see also United States v. Rivera-Rivera, 555 F.3d 277, 283 (1st Cir. 2009) ("In the end, we will affirm the denial of a suppression motion if any reasonable view of the evidence supports it.").

I begin with the relevant background, taken from the district court's rescript. Detective Schaaf knew Cicerano "from his past encounters with law enforcement," and when Cicerano opened the door Det. Schaaf immediately suspected that 63 Menlo Street had become a "drug house." Werra, 2008 WL 4280035, at *1. After entering the building, Det. Schaaf instructed Cicerano to round up the tenants on the upper floors and bring them downstairs. While individuals began to assemble in the foyer, Det. Schaaf "saw movement out of the corner of his eye." Id. at *2. He "turned and saw Werra walking out of the living room towards him" with his hands "in his front pant pockets, 'half in and half out' and 'moving slightly.'" Id. Detective Schaaf "observed a clip of a concealed pocket knife visible outside [Werra's] front right pocket," and promptly relieved Werra of the weapon. Id. At that point, Werra's left hand, which remained in his other pocket, "was

moving a little bit."  Id.  Fearing that Werra might still be armed, Det. Schaaf conducted a pat frisk of Werra's front left pocket.  He felt a hard object that he recognized as a firearm, removed it from Werra's pocket, and handed it to Trooper Fries. Detective Schaaf then placed Werra under arrest.  A brief struggle ensued, after which Werra was subdued and taken into custody.

Based on these findings, which neither party contests, the district court determined that both the detention and frisk were reasonable.  The court noted initially that the circumstances did not warrant a Terry stop because there was no reasonable basis to suspect that Werra was engaged in criminal activity.  See Terry, 392 U.S. at 29 (investigatory stop requires reasonable suspicion "that criminal activity may be afoot").  Nevertheless, it concluded that the officers lawfully detained Werra under Michigan v. Summers, 452 U.S. 692 (1981) (search warrant authorizes limited detention of occupants during search for contraband).  Although the court recognized that Summers involved a search warrant, it reasoned that the logic of Summers applied equally to cases, like this one, where police enter a home in order to execute an arrest warrant.  As for the pat frisk, the court concluded that the limited intrusion on Werra's person was justified because Werra was visibly armed in a drug house suspected of harboring a fugitive. See Sibron v. New York, 392 U.S. 40, 64 (1968); Terry, 392 U.S. at 27.

I think that the pat and frisk is uncontroversial, based largely on the reasons identified by the district court. The more interesting question, in my opinion, is the stop. A prototypical Terry stop takes place on the street. See, e.g., Terry, 392 U.S. at 12 (dealing with "the myriad daily situations in which policemen and citizens confront each other on the street"). We have, however, applied the Terry doctrine to temporary detentions in and around the home, United States v. Beaudoin, 362 F.3d 60, 69-70 (1st Cir. 2004) (summoning the defendant outside his motel room), vacated on other ground sub nom. Champagne v. United States, 543 U.S. 1102 (2005), and although the inquiry in our residential cases tends to focus on officer safety, as far as I can tell we have not formally abandoned the requirement that police articulate reasonable suspicion of criminal activity in order to justify an in-home stop. See, e.g., United States v. Parker, 549 F.3d 5, 8-9 (1st Cir. 2008) (summoning the defendant outside his hotel room on reasonable suspicion of a felony); United States v. Romain, 393 F.3d 63, 75 (1st Cir. 2004) (detaining the defendant in an apartment on reasonable suspicion that he had threatened the person who placed the 911 call).

But I see this case differently. Detective Schaaf and Trooper Fries entered a suspected drug house on the authority of a valid arrest warrant. During the execution of that warrant, they briefly detained a visibly armed occupant who approached them in a

-48-

confined area where they were outnumbered at least two-to-one. In such circumstances, I believe that requiring a showing of articulable criminal activity in order to justify a temporary detention would unreasonably jeopardize officer safety. Like the district court, I would apply the rule in Summers to situations, like this one, where temporary detentions are necessary for the police to execute an arrest warrant safely. And although the district court does not appear to have considered Maryland v. Buie, 494 U.S. 325 (1990) (circumstances surrounding in-home execution of arrest warrant authorize a "protective sweep"), I think that the logic of Buie provides an additional basis for the same result.

I examine each below, beginning with Summers.

## A.

In Summers, police encountered the defendant descending the front steps of his house as they were about to search it for drugs. 452 U.S. at 693. The officers requested his assistance in gaining entry and detained him while they performed the search. Id. They found drugs, arrested the defendant, and charged him with possession. Id. at 693-94. He filed a motion to suppress, which the state trial court granted; that decision was affirmed by divided panels of both the state intermediary and supreme appellate courts. Id. at 694. The Supreme Court took the case and reversed.

Justice Stevens, writing for the majority, held that "a warrant to search for contraband founded on probable cause

-49-

implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." Id. at 705. He reasoned that a "neutral and detached magistrate had found probable cause to believe that the law was being violated in that house and had authorised a substantial invasion of the privacy of the persons who resided there." Id. at 701. A brief detention in that circumstance, he continued, was "less intrusive than the search itself," id., was unlikely to be "exploited by the officer or unduly prolonged," id. at 702, and "would involve neither the inconvenience nor the indignity associated with a compelled visit to the police station." Id.

The defendant's brief detention was also supported by several law enforcement interests. First, Justice Stevens observed that law enforcement had an obvious interest in "preventing flight in the event that incriminating evidence is found." Id. Second, less obvious but sometimes more important, was their interest in "minimizing the risk of harm to the officers" because "the execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence." Id. And third, they and others present had an interest in "the orderly completion of the search" because an occupant's "self-interest may induce them to open locked doors or locked containers to avoid the use of force that is not only damaging to property but may also delay the completion of the task at hand." Id. at 703. All these,

Justice Stevens concluded, further justified the defendant's brief detention while officers performed the search.

Although we have not yet done so, other courts have applied the rule in Summers to cases involving the in-home execution of arrest warrants. United States v. Enslin, 327 F.3d 788, 797-98 (9th Cir. 2003) (police ordered occupant to show hands during in-home execution of an arrest warrant for another occupant); State v. Valdez, 68 P.3d 1052, 1057-58 (Utah App. Ct. 2003) (policed restrained occupant during in-home execution of an arrest warrant for another occupant); People v. Hannah, 51 Cal. App. 4th 1335, 1343-44 (Cal. App. Ct. 1996) (police ordered occupant to remain seated during in-home execution of an arrest warrant for another occupant); see Cherrington v. Skeeter, 344 F.3d 631, 638 (6th Cir. 2003) (involving claims brought under § 1983); Anderson v. United States, 41 F. App'x 506, 507 (2d Cir. 2002) (Sotomayor, J., on panel) (involving claims under the Federal Tort Claims Act).

My review leads me to the same conclusion. Similar law enforcement interests are present in this context. Most importantly, brief detentions in such circumstances are justified because they reasonably minimize the risk of harm to officers and others present. Whether for the purpose of arresting a fugitive or searching for contraband, entering a suspected drug house is dangerous business. In those potentially volatile environments,

-51-

officers must have the authority to briefly detain individuals who might be armed and dangerous, especially when those individuals, like Werra, are visibly armed.  Other courts have permitted similar detentions when the threat to officer safety was far less obvious. See, e.g., Enslin, 327 F.3d at 797-98 (no visible weapons; police ordered occupant to show hands from beneath covers when he had just awakened from sleep); Valdez, 68 P.3d at 1057-58 (no visible weapons; police restrained occupant while he was sleeping because his hands were concealed); Hannah, 51 Cal. App. 4th at 1343-44 (no visible weapons; police ordered occupant to remain seated).

Moreover, such detentions prevent advanced warning of an impending arrest that might cause fugitives to hide or flee the premises.  See Anderson, 41 F. App'x at 507 (holding, in reliance on Summers, that police were justified in detaining occupants during in-home execution of an arrest warrant in light of "the relatively high likelihood that [they] would warn a possibly dangerous person of impending arrest, coupled with the relatively brief period of additional detention involved").  Indeed, such detentions might even facilitate an arrest by inducing detainees to assist the officers in locating a fugitive "to avoid the use of force that is not only damaging to property but may also delay the completion of the task at hand."  Summers, 452 U.S. at 703. Elements of both scenarios are on display in this case.  Cicerano initially agreed to assist the officers by assembling the tenants

downstairs, presumably based on his own self-interest in maintaining decorum in the building.  When Cicerano went upstairs, however, he warned tenants who had warrants -- including Jeanine Daley -- to remain upstairs in order to avoid arrest.  It was only after Det. Schaaf ascended the stairs, following his scuffle with Werra, that he finally apprehended Daley.[28]

Werra argues that the disconnect between a search warrant and an arrest warrant renders Summers inapplicable.  His position is overstated.  True, a search warrant gives the police a ready basis for determining that occupants of a residence subject to search may have done something wrong; an arrest warrant does not.  But in my opinion the salient point in Summers was "the interposition of the magistrate's determination of probable cause between the zealous officer and the citizen."  452 U.S. at 704.  Of course, interposition is present whether the warrant authorizes a search or an arrest.  And, much like the search context, brief detentions in the arrest context are unlikely to be "exploited" or "unduly prolonged," because the end goal is the apprehension of the individual identified in the arrest warrant, not the detention of that individual's co-tenants.  See id. at 702.  In any event, I would not necessarily apply Summers to all detentions in this

---

[28]I do not mean to suggest that police had authority to detain Cicerano.  My point is only that briefly detaining individuals who might be armed and dangerous, like Werra, would prevent them from frustrating the execution of an arrest warrant, and, in some situations, might even facilitate apprehension.

-53-

context, but only those reasonably necessary to protect officer safety. So while the analogy may not be perfectly apt, I think that the distinction is ultimately less important than Werra claims.

## B.

In Buie, police entered the defendant's home in order to arrest him in connection with an armed robbery. 494 U.S. at 328. As the officers fanned out through the first and second floors, one of them announced that he would "freeze" the basement so that no one could come up and catch them off guard. Id. The officer shouted into the basement ordering anyone down there to come out. The defendant soon emerged with hands raised. After he was arrested, another officer entered the basement "in case there was someone else" down there. Id. In the basement, the officer found a red jump suit that connected the defendant to the earlier robbery. The defendant's motion to suppress the suit was denied; a jury later convicted him on the robbery charge. The state intermediary appellate court affirmed, but the state high court reversed on the ground that the suit should have been suppressed. Id. at 389. On certiorari, the Supreme Court reversed.

Authorizing so-called protective sweeps, the Court stated that police may employ "a properly limited sweep in conjunction with an in-home arrest when the searching officer possesses a reasonable belief based on specific and articulable facts that the

-54-

area to be swept harbors an individual posing a danger to those on the arrest scene." Id. at 337. It reasoned that an in-home arrest can pose a greater risk of danger than a typical on-the-street Terry encounter:

> A Terry . . . frisk occurs before a police-citizen confrontation has escalated to the point of arrest. A protective sweep, in contrast, occurs as an adjunct to the serious step of taking a person into custody for the purpose of prosecuting him for a crime. Moreover, unlike an encounter on the street or along a highway, an in-home arrest puts the officer at the disadvantage of being on his adversary's "turf." An ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surrounding.

Id. at 332. In those circumstances, the Court concluded, arresting officers may "take reasonable steps to ensure their safety during, and while making, the arrest," id. at 334, as long as those procedures were "aimed at protecting the arresting officers" and lasted "no longer than is necessary to dispel the reasonable suspicion of danger." Id. at 335.

We have extended Buie when necessary to protect officer safety. For example, we have authorized police to conduct protective sweeps in conjunction with the execution of search warrants, Drohan v. Vaughn, 176 F.3d 17, 22 (1st Cir. 1999); United States v. Daoust, 916 F.2d 757, 759 (1st Cir. 1990), and where the existence of exigent circumstances prompts the entry of police, United States v. Martins, 413 F.3d 139, 149-50 (1st Cir. 2005). See also United States v. Lawlor, 406 F.3d 37, 41-42 (1st Cir.

2005) (applying <u>Buie</u> to protective sweep in house following arrest outside of the home).

Although our cases were within the search context, other courts have applied <u>Buie</u>'s rationale to seizures. In <u>United States v. Maddox</u>, for instance, the Tenth Circuit upheld the detention of a potentially dangerous individual during an in-home arrest. 388 F.3d 1356, 1362 (10th Cir. 2004). There, while police arrested a woman inside a mobile home, the defendant pulled into the mobile home's driveway in a pick-up truck. <u>Id.</u> at 1359. An officer stationed outside saw the defendant reach under his seat; because the officer could not tell whether the defendant was placing or retrieving something under the seat, he interpreted the action as "an unknown threat" and instructed the defendant to remain in the vehicle. <u>Id.</u> The court of appeals agreed that the brief detention was lawful, reasoning that, like a protective sweep, a "protective detention" was an obvious and reasonable measure to ensure officer safety:

> Because the ability to search for dangerous individuals provides little protection for officers unless it is accompanied by the ability to temporarily seize any dangerous individuals that are located during the search, we conclude that detaining potentially dangerous persons for the duration of the arrest qualifies as a "reasonable step[] to ensure the [officers'] safety."

<u>Id.</u> (quoting <u>Buie</u>, 494 U.S. at 334); <u>accord</u> <u>State</u> v. <u>Ugalino</u>, 111 P.3d 39, 48-49 (Haw. Ct. App. 2005) (applying <u>Buie</u> to a protective detention during the in-home execution of an arrest warrant: "Even

-56-

if the officers lacked a reasonable suspicion that [the defendant] was involved in criminal activity, they were justified in fearing that [he] would use a concealed weapon against them if they did not temporarily detain him and perform a pat-down search for weapons.").

I would apply the logic of <u>Maddox</u> in this case. An objectively reasonable officer in the same situation as Det. Schaaf and Trooper Fries would have been concerned for her safety. Although the record does not indicate that their target, Daley, had a history of violence, they nevertheless entered a suspected drug house in order to arrest a fugitive on her "turf." They were in a confined area where they were outnumbered at least two-to-one. And a man, whose hands were concealed in his pockets, approached them armed visibly with a knife. Werra may not have approached the officers in an overtly threatening manner, but the totality of the circumstances reasonably suggested a threat. In response to that threat, Det. Schaaf's actions were correspondingly proportionate: he detained Werra only momentarily in order to remove the knife and performed a pat frisk limited in scope to Werra's other pocket. These minimally invasive actions were "reasonable steps . . . aimed at protecting the arresting officers" and lasted "no longer than [was] necessary to dispel the reasonable suspicion of danger." <u>Buie</u>, 494 U.S. at 334-35.

\*     \*     \*

In sum, based on either <u>Summers</u> or <u>Buie</u>, or under the collective weight of both, I would hold that police have limited authority to detain an individual they encounter during an in-home execution of a valid arrest warrant when they reasonably suspect the individual might be armed and dangerous.  In this case, because I believe Det. Schaaf and Trooper Fries acted reasonably under the circumstances, I would affirm.

## III.

That is enough to affirm the district court's thoughtful decision denying Werra's motion to suppress.  But I will also briefly address the majority's holding that the entry was illegal, because I am concerned about the holding's practical consequences.

I begin, as before, with the district court's findings. On their way to arrest Daley at her last known address, Det. Schaaf and Trooper Fries spoke with a confidential informant ("CI"). <u>Werra</u>, 2008 WL 4280035, at *1.  The CI, whom the officers identified as "Christine," had provided Det. Schaaf "with reliable information concerning the location of a suspect in the past." <u>Id.</u> When asked about Daley's whereabouts, the CI responded that "Daley was staying at 63 Menlo Street" and that she "had seen Daley there recently."[29]  <u>Id.</u>  Based on the CI's tip, and their suspicion that

_____

[29]The majority questions but does not directly challenge the district court's finding that the CI told the officers that Daley was "staying" at 63 Menlo Street.  <u>Ante</u> at 4 n.1, 31 n.19.  In light of the imposing standard that our case law sets, <u>Espinoza</u>,

-58-

Daley -- a known drug user -- might well be staying at a "sober house" like 63 Menlo Street, the officers proceeded to that address instead. Id.; see also id. at *9 ("The tip that Daley was 'staying at' that address came from a previously reliable informant and was consistent with what Schaaf knew about both Daley's drug abuse and the building at 63 Menlo Street."). To increase chances that Daley would be home, they arrived "relatively early in the morning, at approximately 10:00 a.m." Id. at *10.

Although the question is a close one, these findings satisfy Payton's two-prong inquiry that police armed with a valid arrest warrant may "enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." Payton v. New York, 445 U.S. 573, 603 (1980); United States v. Graham, 553 F.3d 6, 12 (1st Cir. 2009) (recognizing that Payton is satisfied when "the police 'reasonably believed' prior to entry that [the suspect] (1) resided at the apartment and (2) would be present").[30]

490 F.3d at 46 ("A finding is clearly erroneous only when, upon a careful review of the record, a court is left with a 'definite and firm conviction that a mistake has been committed.'" (quoting United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948))), the majority properly left that finding intact.

[30] In my view there is no serious question that the "reason to believe" standard is satisfied by something less than probable cause. That is the clear implication of our cases, see Graham, 553 F.3d at 12-14; see also United States v. Weems, 322 F.3d 18, 22 (1st Cir. 2003), and the position of every court of appeals, with one exception, that has considered the question, e.g. United States v. Thomas, 429 F.3d 282, 286 (D.C. 2005) ("the Supreme Court in Payton used a phrase other than 'probable cause' because it meant something other than 'probable cause'"); see generally 3 Wayne R.

As for Payton's first prong, the officers had "reason to believe" that Daley resided at 63 Menlo Street. Detective Schaaf and Trooper Fries obtained information that Daley was "staying at 63 Menlo Street" during a face-to-face encounter with a reliable CI who was personally known to them. It was specific and based on the CI's first-hand observations. And the CI presumably knew that, if that information was false, the officers could find her and hold her accountable. We have not required police to corroborate tips of this ilk in comparable circumstances. Cf. Romain, 393 F.3d at 73 (no independent corroboration required in order for police to make Terry determinations following face-to-face encounter with informant).

Moreover, other courts have held that Payton's first prong was satisfied based exclusively on uncorroborated information gleaned from reliable CIs. For example, in United States v. Gay, the Tenth Circuit held that Payton's first prong was satisfied when police engaged in a "face-to-face discussion" with a CI, who told them "the location of the residence based on personal knowledge," and "presumably remained accountable if the tip was fabricated." 240 F.3d 1222, 1224-25, 1227 (10th Cir. 2001). Here, Daley's

_____

LaFave, Search & Seizure § 6.1 (4th ed. 2007) (collecting cases; stating, "it is generally accepted that the Payton 'reason to believe' requirement . . . involves something less than the traditional probable cause standard"). But see United States v. Gorman, 314 F.3d 1105, 1115 (9th Cir. 2002). Against that backdrop, I see no point in withholding a clear statement of our standard, and thus to propagate uncertainty in future cases.

history of drug abuse, along with the officers' familiarity with Cicerano and 63 Menlo Street's reputation, gave the officers at least some additional indicia that the CI's information was likely correct.[31]

As for Payton's second prong, the officers had "reason to believe" that Daley would be present when they entered. In United States v. Hayes, a case that bears an uncanny resemblance to this one, the Seventh Circuit held that a 10:00 a.m. weekday entry easily satisfied Payton's second prong. 209 F. App'x 548, 551 (7th Cir. 2006). There, the court pointed to a tip from the building's caretaker that the defendant had been there "recently" and to the defendant's history of drug abuse. Id. (observing that the defendant was "an unemployed drug addict with no car"); see also Valdez v. McPheters, 172 F.3d 1220, 1230 (10th Cir. 1999) (noontime entry on weekday reasonable in part because the defendant "sometimes abused drugs").

---

[31]The majority says that Gay is distinguishable because, there, the CI "accompanied officers to that location and told them the suspect was 'presently in his home.'" Ante at 30 n.18 (quoting Gay, 240 F.3d at 1225). That is, of course, an accurate description of the facts in Gay. But the Payton test has two prongs, and each requires separate analysis. Gay holds, directly contrary to the majority's holding here, that Payton's first prong is satisfied based exclusively on an uncorroborated tip from a CI. Gay, 240 F.3d at 1227. The fact that I rely on other authority concerning Payton's second prong -- discussed below -- is quite beside the point.

Similarly, here: the officers entered 63 Menlo Street at 10:00 a.m. on a weekday based on a tip from a reliable CI who had seen Daley there "recently" and their knowledge that she had a history of drug abuse. Considering also that Daley was a fugitive, see El Bey v. Roop, 530 F.3d 407, 418 (6th Cir. 2008) (the defendant's "fugitive status also increased the likelihood that he might be at home during business hours"), the officers could reasonably assume that she was at home when they entered. See generally 3 LaFave, Search & Seizure § 6.1 (collecting cases; stating, "in the absence of facts tending to show that the defendant is not at home it is reasonable to infer that he would be there").[32]

The prompt execution of arrest warrants serves an important governmental interest. Armed with new and reliable information about a suspect's whereabouts, police should be able to

---

[32]The majority asserts that Hayes and other so-called time-of-day precedents are distinguishable because, in those cases, "there was no serious question that the location of the arrest was where the defendant lived," ante at 28 (emphasis supplied), and, similarly, "the location of the suspect's residence was well established," id. at 30 n.18 (emphasis supplied). Again, the majority improperly conflates Payton's two prongs. See supra note 10. In any event, I am not aware of any case that requires the government to prove residency beyond "serious question," or show that a suspect's residence is "well established," in order for it to rely on the time of day as a basis for believing the suspect is at home. Rather, at the risk of repetition, the test is "reason to believe." Payton, 445 U.S. at 603; Graham, 553 F.3d at 13 ("the police need not possess such rock-solid indicators of residence in order to form a 'reasonable belief' that a suspect resides at a given place"). I reject the suggestion that more is required.

respond rapidly. This is especially true with respect to fugitives, who often take steps to avoid apprehension. In this case, requiring the police to delay apprehension in order to verify information they obtained from a reliable CI disserves that interest and upsets the balance Payton sought to strike.

I respectfully dissent.